**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Essam Helmi EL SHAMI, a/k/a Essam Hamed Elshami, a/k/a Sam Helmi, a/k/a Helmy Asam, a/k/a Shamy Asam, a/k/a Sam Helmy Shamy, a/k/a El Shami Essam, Defendant–Appellant.**

No. 04–4662.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 28, 2005.

Decided Dec. 27, 2005.

**ARGUED:** Frances Hemsley Pratt, Office of the Federal Public Defender, Alexandria, Virginia, for Appellant. Charles Everett James, Jr., Assistant United States Attorney, Office of the United States Attorney, Richmond, Virginia, for Appellee. **ON BRIEF:** Frank W. Dunham, Jr., Federal Public Defender, Michael S. Nachmanoff, Assistant Federal Public Defender, Alexandria, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Michael J. Elston, Assistant United States Attorney, Alexandria, Virginia, for Appellee.

Before WIDENER, NIEMEYER, and GREGORY, Circuit Judges.

Vacated in part and remanded by published opinion. Judge GREGORY wrote the majority opinion, in which Judge NIEMEYER joined. Judge WIDENER wrote a dissenting opinion.

## OPINION

GREGORY, Circuit Judge.

Essam Helmi El Shami ("El Shami" or the "defendant") appeals his conviction for unlawful reentry of a deported alien under 8 U.S.C. § 1326(a) and (b)(2).[1] Although a jury also convicted El Shami of one count of social security fraud and one count of credit card fraud, he does not appeal these convictions. El Shami argues that this court should vacate his illegal reentry after deportation conviction under 8 U.S.C. § 1326(d) because he satisfies the three requirements for a collateral attack of a prior deportation order under 8 U.S.C. § 1326(d).[2] Because we conclude that the prior deportation order was flawed under section 1326(d), we vacate the illegal reentry conviction.

## I.

In May 2003, El Shami was arrested in Colonial Heights, Virginia, after being found in possession of numerous fraudu-

lent documents, including fraudulently obtained credit cards and social security cards. After determining that El Shami had been deported to Egypt in August 1994 pursuant to an order of the Immigration and Naturalization Service ("INS") and had never received permission to reenter this country, the United States charged El Shami with illegal reentry after deportation.

The facts underlying El Shami's deportation are as follows. El Shami immigrated to the United States from Egypt in 1980 and became a permanent resident alien in 1984. The defendant married a United States citizen and owned and operated two successful businesses in the New Jersey area. On July 2, 1986, El Shami was convicted of criminal sexual contact in the New Jersey Superior Court for Passaic County. El Shami was convicted of aggravated arson in the same court on August 7, 1990.

Subsequently, in early 1993, INS officials initiated deportation proceedings. On March 11, 1993, INS agents personally served El Shami with an order to show cause and notice of a hearing at his residence in Guttenberg, New Jersey. This order to show cause informed El Shami that he was subject to deportation under the Immigration and Nationality Act for being previously convicted of two crimes of moral turpitude: criminal sexual contact

---

1. Section 1326(a) prohibits any alien who has been ordered deported or removed from the United States from re-entering the United States without permission of the Attorney General. Section 1326(b)(2) increases the penalty for illegal reentry for aliens whose removal was subsequent to a conviction of an aggravated felony. See 8 U.S.C. § 1326(a-b).

2. El Shami argues three additional grounds for vacating the illegal reentry conviction. First, El Shami contends that the district court erred in permitting the United States to introduce his aborted plea agreement and accompanying statement of facts at trial when

the record clearly demonstrated that El Shami had not knowingly and voluntarily waived his protections under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f). Second, El Shami asserts that the district court erred in denying his motion for judgment of acquittal as to the unlawful reentry charge. Finally, El Shami submits that the district court plainly erred by allowing the jury to consider hearsay evidence. Because we decide the issue on the first ground, we do not address these alternative arguments for vacating the conviction.

and aggravated arson. After being taken into custody by INS and transferred to Oakdale, Louisiana, El Shami appeared for a bond hearing on March 30, 1993. At that hearing in Louisiana, the immigration judge released El Shami on a $20,000 bond. After his release, El Shami provided the INS with his address of record in Guttenberg, New Jersey, for all correspondence regarding the scheduling of his deportation hearing. After returning to New Jersey, El Shami hired an attorney, who successfully moved for a transfer of the deportation proceedings to the immigration court in New Jersey.[3]

Once the case was transferred to New Jersey, the immigration court eventually scheduled the final deportation show cause hearing for October 28, 1993. Although El Shami did not appear at this hearing, the immigration judge proceeded in absentia and ordered El Shami deported to Egypt. Subsequently, in August 1994, INS officials took El Shami into custody and deported him to Egypt.

The United States was unable to produce any evidence demonstrating that the INS had sent El Shami or his attorney written notice of the date and time of the October 28 hearing.[4] However, El Shami and his wife testified at the hearing on the defendant's motion to dismiss the illegal reentry charge that the defendant never received notice of the hearing at his address of record. Indeed, these witnesses testified that El Shami only learned of the October 28 deportation hearing nine months afterwards, when he received a copy of the deportation order in the mail.

After being arraigned on the illegal reentry after deportation and fraud charges in November 2004, El Shami filed a motion to dismiss the illegal reentry charge on the grounds that defects in his 1993 deportation proceedings rendered the deportation order invalid under 8 U.S.C. § 1326(d). The district court denied this motion, concluding that even if El Shami had been deprived notice of his deportation hearing, he was unable to demonstrate actual prejudice.[5] See J.A. 4–5.

With respect to the district court's denial of his motion to dismiss the illegal reentry charge under 8 U.S.C. § 1326(d), the defendant argues that the court erred because it misunderstood the state of the

3. After learning that the immigration court in Louisiana had scheduled El Shami's deportation hearing for April 23, 1993, in Louisiana, El Shami's attorney faxed a motion to transfer venue to the Department of Justice Office of the Immigration Judge. This motion was either misplaced or never received by the immigration court in Louisiana. Neither El Shami or his attorney appeared in Louisiana for the April 23 hearing. When El Shami did not appear, the immigration judge continued the hearing until April 30, 1993, and a letter was mailed to counsel in New Jersey informing him of the new date and time. Neither the defendant or his counsel appeared at the April 30 hearing. Shortly thereafter, an official with the immigration court in Louisiana contacted El Shami's attorney by telephone to inquire as to the reason for El Shami's nonappearance. During this conversation, the official informed El Shami's attorney that the

court had never received his transfer motion. Subsequently, the court granted defense counsel a two-week extension to re-file a motion to transfer venue, which the immigration judge granted. See J.A. 80–89.

4. Although the INS sent notice of the hearing date to El Shami's bond holder, J.A. 91, there is no evidence that the bond holder forwarded this information to El Shami. The United States does not contend otherwise.

5. There are additional facts pertinent to El Shami's second, third, and fourth arguments for overturning the illegal reentry conviction. However, to the extent we reverse only on the basis of the propriety of the original deportation proceeding under 8 U.S.C. § 1326(d), a discussion of facts relating to the plea negotiations and the trial proceedings would be superfluous.

record and the applicable standard of prejudice. Appellant's Br. at 21, 29. Because El Shami never received notice of a hearing, the defendant argues that he was denied the opportunity (1) to challenge the factual or legal basis for the deportation, by disputing the INS's evidence or presenting his own evidence; (2) to apply for relief from deportation under section 212(c) of the Immigration and Naturalization Act, 8 U.S.C. § 1182(c); (3) to appeal the deportation order to the Bureau of Immigration Affairs ("BIA"); [6] and, if applicable, (4) to appeal the BIA order to the United States Court of Appeals for the Third Circuit. Further, El Shami contends that the district court erred in concluding that, even assuming the above deprivations, the defendant could not demonstrate actual prejudice—i.e., that but for the errors complained of there was a reasonable probability that the alien would not have been deported.

The United States responds that the district court properly denied the motion to dismiss the illegal reentry charge, because the INS afforded the defendant all due process protections. Even if the INS's failure to advise El Shami of the date and time of his final hearing constitutes a due process violation, the United States contends that El Shami's collateral attack still fails because he cannot show actual prejudice. Accordingly, the United States argues that El Shami cannot meet the requirements for a valid collateral attack of an illegal reentry charge under 8 U.S.C. § 1326.

## II.

This Court reviews de novo the denial of a motion to dismiss a charge under 8 U.S.C. § 1326(d). *See United States v. Wilson,* 316 F.3d 506, 509 (4th Cir.2003).

Because a deportation order is an element of the offense of illegal reentry, the Supreme Court has recognized that an alien can collaterally attack the propriety of the original deportation order in the later criminal proceeding. *See United States v. Mendoza–Lopez,* 481 U.S. 828, 838–39, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). In order to successfully attack the underlying deportation order, the defendant must satisfy three requirements. *Wilson,* 316 F.3d 506; 8 U.S.C. § 1326(d). The alien must demonstrate that

(1) he exhausted any administrative remedies that may have been available to seek relief against the order;

(2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3) the entry of the deportation order was fundamentally unfair.

*Id.* "These requirements are listed in the conjunctive, so a defendant must satisfy all three in order to prevail." *Id.* However, if the defendant satisfies all three requirements, the illegal reentry charge must be dismissed as a matter of law. *See id.*

## A.

Because we find that the INS did not provide El Shami with written notice of the October 1993 deportation hearing as the statute required, we conclude that he satisfies the first two requirements for a collateral attack under 8 U.S.C. § 1326(d). The undisputed evidence indicates that El Shami lived at the address of record that he provided to immigration officials after his release on bond pending the show cause hearing on March 30, 1993, until he was deported in August 1994. Under the law as it stood in 1993, the INS was re-

---

**6.** At a deportation hearing, the immigration judge must inform the alien of his right to appeal the disposition. 8 C.F.R. § 242.16(a) (1993).

quired to serve upon the alien or his attorney in person, or, if service was impracticable, send by certified mail, written notice informing the alien, *inter alia,* of the time and date of the deportation hearing. 8 U.S.C.A. § 1252b(a)(2)(1993). Both El Shami and his wife testified that they did not receive any correspondence from the INS regarding the final deportation hearing during the period of April through October 1993. Further, during the pendency of this matter in the district court, the United States stipulated that there was no evidence in El Shami's immigration file to reflect that the INS had sent El Shami written notice of the final deportation hearing. Thus, on the basis of the uncontradicted evidence in the record, we find that El Shami did not receive notice of the October 1993 deportation hearing.

■ The United States nevertheless argues that El Shami cannot meet the exhaustion requirement because he never appealed the immigration judge's order of deportation to the BIA within thirty days.[7] This argument misses the mark. Because the INS never sent El Shami written notice of the deportation hearing, El Shami did not appear and, thus, was never informed of his right to appeal to seek administrative and judicial review. Indeed, El Shami did not find out that he had been ordered deported until he received a copy of the deportation order nine months after the deportation hearing, well after the time for seeking review had expired. As El Shami aptly concludes in his reply brief, the United States' argument that he did not exhaust his administrative remedies "begs the question, for without notice of the hearing in the first instance, Mr. El Shami did not know about either the existence or the nature of the immigration judge's ruling. Without that knowledge he

could not appeal to the [BIA] and, if necessary, to the U.S. Court of Appeals for the Third Circuit." Appellant's Reply Br. at 4. We agree.

In *United States v. Mendoza–Lopez,* 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), the Supreme Court held that an immigration judge's failures to advise the alien of his right to apply for section 212 relief and to ensure that the alien's waiver of his right to appeal the deportation order constituted a complete deprivation of administrative and judicial review within the meaning of section 1326(d). *See id.* at 840, 107 S.Ct. 2148. This case falls squarely within the rule of *Mendoza–Lopez.* To the extent that the INS's failure to provide notice precluded El Shami from attending his deportation hearing in the first instance, he was never apprised of his right to seek section 212 relief and administrative and judicial review. Accordingly, we hold El Shami satisfies the first two requirements for a collateral attack under section 1326(d). *See id.*

### B.

■ We next turn to the question of whether the entry of the deportation order was fundamentally unfair. We find that it was. To demonstrate fundamental unfairness, "a defendant must show that (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." *Wilson,* 316 F.3d at 510.

■ The INS's failure to send El Shami written notice of his deportation hearing deprived him of due process. As then Judge Chertoff recognized in *United States v. Torres,* 383 F.3d 92 (3rd Cir. 2004), an alien's "fundamental" right of due process "is the opportunity to be

---

**7.** Under the law as it existed in 1993, the alien only had thirty days following the entry of the deportation order to file an appeal. 8 U.S.C. § 1105a(a)(1)(1993).

heard at a meaningful time and in a meaningful manner. More specifically, . . . due process requires an alien who faces [removal] be provided (1) notice of the charges against him, (2) a hearing before an executive or administrative tribunal, and (3) a fair opportunity to be heard." *Id.* at 104 (internal quotation marks and citations omitted). Although El Shami was aware of the charges against him, the INS's failure to provide notice of the hearing deprived him of the opportunity to contest those charges or otherwise seek relief from deportation from the administrative tribunal. Therefore, we hold that El Shami satisfies the due process prong of the fundamental unfairness requirement.

The last element that El Shami has to show under the fundamental unfairness requirement is that the deficiencies in the deportation proceedings caused him actual prejudice. *See Wilson,* 316 F.3d at 509. Specifically, El Shami must show that, but for the errors complained of, there was a reasonable probability that he would not have been deported. *Wilson* 316 F.3d at 511.

In the instant case, El Shami would have sought relief from deportation under section 212(c) of the Immigration and Naturalization Act. *See* 8 U.S.C. § 1182(c)(1994 & Supp.). This provision, which was subsequently repealed by the passage of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, authorized an immigration judge to waive deportation upon a showing that certain mitigating factors outweighed adverse factors. *See Matter of Marin,* 16 I. & N. Dec., 581, 584 (BIA 1978). In 2001, the Supreme Court held that the AEDPA did not apply retroactively. *See INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Therefore, because section 212(c) relief

was available to El Shami at the time of his deportation proceeding in 1993, we must consider the likelihood that the immigration judge or the BIA would have waived deportation under section 212 in determining whether there is a reasonable probability that he would not have been deported.

We find that El Shami has made such a showing. In determining whether to grant relief from deportation, the immigration judge would have weighed adverse factors against mitigating factors. *See Matter of Marin,* 16 I. & N. Dec. 581, 584 (BIA 1978). Adverse factors included: (1) the nature and circumstances of the offense that led to the initiation of deportation proceedings; (2) additional violations of the immigration laws; (3) the existence of a criminal record; and (4) evidence of bad character. *Id.* Mitigating factors included: (1) family ties in the United States; (2) lengthy residence in the United States; (3) hardship to the alien and his family if deportation occurs; (4) existence of property or business ties; (5) evidence of good character and reputation in the community; (6) proof of rehabilitation if a criminal record exists. *Id.*

Although El Shami had two serious felony convictions on his record, there is substantial mitigating evidence in the record. Specifically, El Shami had lived in the United States for thirteen years at the time of the deportation hearing. Further, El Shami had a wife and a son, both of whom were citizens of the United States and depended on him for financial support. At the time of his deportation hearing, El Shami owned a small business in New Jersey, on which he paid federal income taxes. We also note that El Shami complied with the terms and conditions of his release on bond from the time of his release in April 1993 until the final deportation hearing on October 1993. These are

substantial facts that El Shami could have presented at the time of his final deportation hearing to obtain § 212 relief. Finally, we note that the Supreme Court has recognized that between 1989 and 1995, the interval during which El Shami would have sought waiver, over fifty percent of aliens who requested section 212 relief received it. *See St. Cyr*, 121 S.Ct. at 2277, 533 U.S. 289. Accordingly, we hold that El Shami satisfies the second prong of the fundamental unfairness requirement under 8 U.S.C. § 1326(d).

### III.

Because we find that El Shami satisfies the three requirements for a collateral attack of conviction for unlawful reentry of a deported alien under 8 U.S.C. § 1326(d), we vacate the judgment of conviction on that count and remand to the district court for re-sentencing.[8]

*VACATED IN PART AND REMANDED.*

WIDENER, Circuit Judge, dissenting:

The majority correctly identifies the facts relevant to El Shami's motion to dismiss Count One of the indictment, which tend to show that El Shami did not receive notice of his deportation proceeding. But the majority errs in applying to these facts the rules for collateral attack on a deportation order under 8 U.S.C. § 1326(d) and *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). Because El Shami did not establish a reasonable probability that he would not have been deported but for the lack of notice, I respectfully dissent.

In *United States v. Wilson*, 316 F.3d 506 (4th Cir.2003), we held that to show an order is "fundamentally unfair" under section 1326(d)(3), a deported alien must show prejudice. *Id.* at 509. As the majority acknowledges, this requires a showing that there was a "reasonable likelihood" that the alien would not have been deported but for the defect in the deportation proceeding. *Id.* at 511. In *Wilson*, the alien's counsel had claimed a "fifty-fifty" chance of a different outcome, which the district court deemed insufficient to establish prejudice under the governing standard. *Id.* We concluded that Wilson's actual chance of obtaining a reversal was lower than fifty-fifty and that he had "demonstrated none of the 'unusual or outstanding favorable equities'" necessary to suggest "a favorable exercise of discretion under section 212(c)." We thus affirmed the deportation. *Id.* at 514.

Like Wilson, El Shami did not demonstrate "unusual or outstanding equities." The majority identifies, as evidence in his favor, that El Shami had lived in the United States for thirteen years; has a wife and son, both dependent on him; owned a small business in New Jersey and paid income taxes on its revenues; and complied with the conditions of his release on immigration bond. Op. 665–66. In my view, these are only ordinary factors. Indeed, Wilson had lived in the United States for longer, over seventeen years, and had served for nearly all of that time in the United States Marine Corps, from which he had a bad conduct discharge. 316 F.3d at 508. Presumably this service involved paying income taxes, not to mention suffering the other hardships associated with military life. That leaves as the principal distinguishing factor El Shami's dependent wife and son; but this ordinary qualification for relief should not covert El

---

8. We express no opinion on the merits of El Shami's alternative arguments for vacating the illegal reentry conviction.

Shami's case into one of unusual hardship. See, e.g., *United States v. Muro–Inclan,* 249 F.3d 1180, 1185–86 (9th Cir.2001) noting that family hardship is nothing more than a "common result" of deportation and explaining that "a finding of plausibility on this showing would require a finding of plausibility, and therefore prejudice, in almost every case." And, as with tax compliance, instead of lauding El Shami for complying with the conditions of his release under bond, the law demands no less.

While the majority mentions, it underweighs the factors working against El Shami: his credit-card fraud and possession of false social security documents, his illegal reentry after deportation, his criminal record, and certain evidence of bad character. Op. 665. In particular, the majority's passing reference to El Shami's "two serious felony convictions" understates the equities. The New Jersey statutes under which El Shami was convicted give a clue as to the nature of the crimes initially rendering him deportable: New Jersey Code section 2C:14–3b prohibits criminal sexual contact; and section 2C:17–1a(2) prohibits arson with the purpose of destroying the building or structure of another. The pre-sentence report indicates that El Shami was convicted of "criminally intentionally touching the breast" of the victim, "with the intention of degrading her." El Shami was also charged with stealing her luggage. The details of the arson are not contained in the report. In addition to these convictions, El Shami had been convicted of "arson assault," simple assault, third-degree theft by deception, unlawful possession of a weapon, and soliciting transportation for hire and trespassing. Docket No. 82 at 13–14.

El Shami's sex crime, though not a rape, see *Gouveia v. I.N.S.,* 980 F.2d 814, 818–19 (1st Cir.1992), is undoubtedly most serious and the burning of another's property is more than enough, in my view, to outweigh any credit El Shami is due for running two businesses and paying taxes. His combined crimes, I suggest, impose a higher hurdle. In sum, though I appreciate the difficulty involved in speculating as to what an immigration judge would have done when confronted with such evidence, I cannot agree that it is "reasonably probable" that the immigration judge would have excused El Shami from deportation in these circumstances.[1]

It should be noted that an immigration judge sitting in 1993 would have had scant, if any, evidence of rehabilitation. In contrast, we have the benefit of what has since transpired. For example, within 17 months of his deportation El Shami had returned to the United States and had been convicted of a drug crime. More relevant to the crimes at issue here, in 1996 El Shami escaped punishment for using the identification of another person, but in early 1999 he pleaded guilty of using the same person's identification to fraudulently purchase jewelry. And El Shami's identity thievery was just beginning: in June 2000 he pleaded guilty to two counts of financial identity fraud using two additional names, Docket No. 82 at 17–18; and in December 2000 he pleaded guilty to 59 counts of obtaining property by false pretense using over 30 different persons'

---

1. The majority's reliance, op. 666, on the Supreme Court's observation that over half of all section 212(c) motions were granted during this period does not speak to the equities of this case. See *United States v. Aguirre–Tello,* 353 F.3d 1199, 1210 (10th Cir.2004) (en banc) (rejecting identical argument: "Without any indication that any of those successful applicants were similarly situated to [the alien], the conclusion that he had at least a 50% chance of receiving a discretionary waiver is pure speculation, if not actually misleading.").

names and other information concerning them, *id.* at 18–25, including the names "Jonathan Harris" and "Matthew Harris," which names El Shami nevertheless continued to use to commit the crimes at issue in these proceedings. On the basis of this record, the district court, in sentencing in this very case, described El Shami to be "a hard[-]core recidivist." Docket No. 84 at 7. Our hypothesizing about what might have occurred in 1994 should not ignore these facts.

El Shami's crimes, though perhaps not as serious as his sex crime and arson, are hardly victimless. Indeed, El Shami was ordered to pay restitution to nine businesses of over $42,000. More importantly, his latest scheme—executed over nearly three weeks from May 5, 2003 until he was arrested on May 25—involved personal information with respect to four people. A victim-impact statement in the record describes El Shami's use of another's Social Security number as a "13 month nightmare" which, among other impacts, prevented that victim from refinancing a mortgage. Docket No. 72. Nor did the fraudulent documents fall into his lap. As in his previous crimes, El Shami possessed credit cards, social security cards, two resident alien cards, checks, and driver's licenses in various names not his own. In short, the facts of the admitted crimes prove El Shami's continuing disregard for other people, to say nothing of the law.[2]

---

2. I also question, and properly to be examined on remand, whether El Shami may be excused from the statutory requirement of exhaustion in a collateral attack. See 8 U.S.C. § 1326(d)(1). El Shami admits having received notice of the deportation order, at the latest, around July 10 or 11, 1994. El Shami immediately went to his lawyer, who said he would take care of it, but it appears that the lawyer did nothing, perhaps because he was ill. (JA 113, 115, 119.)

Under the then-applicable regulations, El Shami had "ten (10) calendar days after service of the decision" to appeal to the Board of Immigration Appeals, thirteen days if service was by mail, 8 C.F.R. 3.38(b) (1994), service being defined as sending a written decision to "the parties by first class mail to the most recent address contained in the Record of Proceeding or by personal service," 8 C.F.R. 3.37(a) (1994). It appears that El Shami's counsel believed that appeal would have required "exceptional circumstances" under 8 U.S.C. § 1252b(c)(3)(A), which appeal would have been time barred because 180 days had passed since the October 28, 1993 deportation order issued. But that statute concerns motions for rescission, and section 1105a, cited by the majority, op. 664, n. 7, governed petitions for review in the Courts of Appeals. For administrative purposes, because there is no proof that the deportation order or notification thereof was served on El Shami until July 1994, and indeed all evidence suggests otherwise, op. 662, the Board would have had jurisdiction to consider an otherwise belated appeal in July 1994. See *Quedraogo v. I.N.S.,* 864 F.2d 376, 378 (5th Cir.1989) ("Because the INS cannot establish when it mailed the Board's decision, we decline to dismiss the [jurisdictionally untimely] appeal."). It is true that *Mendoza–Lopez* speaks of judicial review, 481 U.S. at 837–39, 107 S.Ct. 2148, but a Board decision on the merits would have enabled such review since our review jurisdiction depends on the date of the final agency action.

Moreover, any suggestion that the Board lacked jurisdiction effectively would require *presuming* that service of the deportation order occurred sometime before July 1994. But, since El Shami's address was the same throughout this period, such a presumption would seem to apply equally to the notices of the deportation hearing that El Shami claims never to have received. In sum: either there is a presumption of notice based on mailings to a record address, in which case the immigration judge's finding of notice (JA 482) should not be disturbed solely on El Shami's testimony that he never received notice, see 8 C.F.R. 3.26 (1994) (allowing *in absentia* hearings), or there is no such presumption, in which case El Shami had an appeal to the Board that he did not take.

The majority also states that El Shami never received notice of his right to appeal, which it suggests only could have occurred at the hearing. Op. 664. But this record—El Shami's walking to his lawyer's office to show

Accordingly, I would affirm the validity of El Shami's deportation and reach the other arguments raised in this appeal.

him the notice of deportation, and the fact that they discussed an appeal—demonstrates El Shami's actual knowledge of his appeal rights. If anything, his lawyer may have rendered ineffective assistance—a claim El Shami also never pursued. None of this excuses El Shami's failure to appeal to the Board in the context of a collateral attack.