**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4193**

---

UNITED STATES OF AMERICA,

 Plaintiff – Appellee,

v.

OMAR ALFONSO ALAS,

 Defendant – Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, Senior District Judge. (3:21−cr−00051−REP−1)

---

Argued: January 24, 2023                                   Decided: March 24, 2023

---

Before WILKINSON and DIAZ, Circuit Judges, and Max O. COGBURN, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Diaz and Judge Cogburn joined.

---

**ARGUED:** Joseph Stephen Camden, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant. Joseph Attias, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Geremy C. Kamens, Federal Public Defender, Alexandria, Virginia, Caroline S. Platt, Los Angeles, California, Laura J. Koenig, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant. Jessica D. Aber,

United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

―――――――――

WILKINSON, Circuit Judge:

Omar Alfonso Alas illegally entered the United States in 2004 and was arrested three years later in Virginia for malicious wounding. He was deported to El Salvador in 2011 but later reentered the country. He was interviewed by police in 2016 in connection with a dispute involving his employer but was not charged with illegal reentry at that time. In 2020, Alas was arrested in Virginia for assault and battery. He was then indicted for illegal reentry in 2021. Alas twice moved to dismiss that indictment, arguing that the five-year statute of limitations on his prosecution had run and that his crime of malicious wounding was not a deportable offense. The district court rejected Alas's claims. Because we likewise find his arguments unpersuasive, we affirm the district court's judgment.

## I.

## A.

Omar Alas was born and raised in El Salvador. He made his way across the Mexican border into the United States without authorization in 2004. Three years later, he was arrested and pleaded guilty in Virginia state court to malicious wounding in violation of Virginia Code § 18.2-51. Alas was sentenced to multiple years in prison.

Once he completed his sentence, Alas was released into Immigration and Customs Enforcement (ICE) custody. He was then served with an administrative removal order— Form I-851—which initiated expedited removal proceedings against him. The form, presented to Alas in English, charged that Alas was deportable for being an alien convicted of an aggravated felony, namely malicious wounding. Alas signed the form, waiving his right to judicial review, and was removed to El Salvador in 2011.

3

Sometime after 2011, Alas reentered the United States without authorization. He resurfaced at a Texas hospital on April 4, 2016, after being assaulted by his employer. Deputy P. Landaverde from the Harris County Sheriff's Office (HCSO) visited Alas in the hospital to ask him about the attack. Alas told Landaverde that, because he was in the country illegally, he avoided reporting assaults for fear of deportation. Landaverde assured Alas that he would not report him to immigration officials.

Important to this appeal, the Harris County Sheriff's Office was operating under a memorandum of agreement with ICE in 2016 when Deputy Landaverde spoke with Alas. Under § 287(g) of the Immigration and Nationality Act, the agreement designated certain officers and employees of the HCSO to enforce federal immigration laws within its jurisdiction. 8 U.S.C. § 1357(g). The parties agree that neither Deputy Landaverde nor any other officer involved in the exchange with Alas were designated under the agreement to enforce federal immigration laws.

In 2020, Alas was again arrested in Virginia on charges of assault and battery. A background search revealed that Alas had been previously deported, so ICE subsequently issued a warrant for his arrest in April 2021. Alas was arrested pursuant to ICE's warrant. A grand jury in the Eastern District of Virginia indicted him on May 18, 2021, for illegal reentry into the United States, in violation of 8 U.S.C. § 1326.

B.

Alas twice moved to dismiss his indictment. In his first motion to dismiss, Alas asserted that his indictment was barred by the five-year statute of limitations because he was "found in" the United States for purposes of 8 U.S.C. § 1326(a)(2) when he spoke with

4

Deputy Landaverde on April 4, 2016. Because he was not indicted until May 2021, Alas claims he was not prosecuted within the required five-year period.

In a second motion to dismiss, Alas collaterally attacked his 2011 removal order. He argued that the order was invalid under 8 U.S.C. § 1326(d)(3) because his conviction for malicious wounding was not an aggravated felony. The relevant statute defines an aggravated felony as, among other things, "a crime of violence." 8 U.S.C. § 1101(a)(43)(F). Alas insisted that Virginia malicious wounding is not a crime of violence because it can be committed recklessly. Alas also claimed under § 1326(d)(2) that the immigration official's failure in 2011 to explain the notice of removal in a language Alas understood prevented his waiver of judicial review from being voluntary and intelligent.

The district court denied each motion. Regarding the statute of limitations, the court found "untenable" Alas's claim that he was "found in" the United States when he spoke with Deputy Landaverde in 2016, given that Landaverde was not designated to enforce federal immigration laws under § 287(g). J.A. 329. Regarding the collateral challenge to the removal order, the court relied on governing Fourth Circuit precedent to reject Alas's assertion that malicious wounding is not a crime of violence. Because it concluded Alas could not satisfy § 1326(d)(3), the district court did not rule on Alas's argument that he satisfied § 1326(d)(2).

Alas then entered a plea agreement, pleading guilty to illegal reentry but preserving his right to appeal the denial of his motions to dismiss. The court sentenced Alas to 24 months in prison, followed by three years of supervised release.

5

On appeal, Alas presses the same arguments as below: First, the statute of limitations has run because he was "found in" the United States in April 2016. Second, his 2011 removal order was invalid because malicious wounding is not a crime of violence. Finding neither argument persuasive, we affirm the district court.

II.

We first consider Alas's statute of limitations claim. We review a district court's "factual findings on a motion to dismiss an indictment for clear error" and "its legal conclusions de novo." *United States v. Hosford*, 843 F.3d 161, 163 (4th Cir. 2016) (internal quotation marks omitted).

A.

The statute governing the reentry of removed aliens provides that "any alien who has been denied admission, excluded, deported, or removed" from the United States "and thereafter enters, attempts to enter, or is at any time *found in*, the United States" shall be punished by fine, up to two years in prison, or both. 8 U.S.C. § 1326(a) (emphasis added). A person violates the law when (1) he is an alien; (2) he was deported or removed from the United States; (3) he thereafter reentered (or attempted to reenter) the United States; and (4) he lacked permission to do so. *United States v. Ayon-Brito*, 981 F.3d 265, 269 (4th Cir. 2020).

If the alien succeeds in reentering the country surreptitiously, as opposed to being stopped at the border, the offense is complete when the alien is "found in" in the United States. *Ayon-Brito*, 981 F.3d at 270; *United States v. De Leon-Ramirez*, 925 F.3d 177, 182 n.2 (4th Cir. 2019) (collecting cases). As with many other non-capital federal offenses, "an

6

indictment charging a violation of § 1326 must be handed down 'within five years next after such offense shall have been committed.'" *United States v. Mercedes*, 287 F.3d 47, 54 (2d Cir. 2002) (quoting 18 U.S.C. § 3282). When determining whether an indictment for illegal reentry is within the five-year statute of limitations, therefore, a court must assess when that alien was "found in" the United States.

As a general rule, because only the federal government can enforce immigration laws, the alien is "found" when he is discovered by federal, not state, officials. *United States v. Uribe-Rios*, 558 F.3d 347, 353 (4th Cir. 2009); *see also Arizona v. United States*, 567 U.S. 387, 408 (2012). Section 287(g) of the Immigration and Nationality Act provides an exception to this rule. The program established by Section 287(g) is a "principal example" of the "limited circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408.

Section 287(g) provides the following:

> [T]he Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States . . . may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

8 U.S.C. § 1357(g)(1). Under this provision, certain qualified state officers and employees specified by the agreement may enforce federal immigration laws. The statute further "require[s] that an officer or employee . . . performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function," and that these

7

"officers or employees . . . receive[] adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g)(2).

In short, Section 287(g) "permits ICE to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement," and "ICE trains the local law enforcement officers who participate." *United States v. Sosa-Carabantes*, 561 F.3d 256, 257 (4th Cir. 2009). An alien found by a state officer designated and trained under Section 287(g) to enforce federal immigration law would be "found in" the United States. *Id.* at 260. Conversely, an alien found by a state officer not designated and trained under Section 287(g) is not "found" under § 1326(a)(2).

With this in mind, we turn to the case at hand.

### B.

Alas does not dispute that he illegally reentered the United States. Nor could he. Alas is (1) an alien; he was (2) deported; and he (3) reentered the United States (4) without permission to do so. *Ayon-Brito*, 981 F.3d at 269. Attempting to skirt these facts, Alas insists that he was not prosecuted for his crime within five years of being "found in" the United States.

According to Alas, he was "found" on April 4, 2016, when he spoke with Deputy Landaverde. Alas concedes that Landaverde was not personally designated under Section 287(g) to enforce federal immigration law. Yet Alas believes that because Landaverde's employer—the Harris County Sheriff's Office—had a Section 287(g) agreement with ICE, *all* Harris County officers could enforce federal immigration laws, including Landaverde.

8

We disagree. Alas's argument collides with the text of both the governing statute and the specific agreement between the HCSO and ICE. Additionally, Alas ignores the realities of enforcing federal immigration law, which is no job for amateurs. Given the system carefully constructed by Congress for enforcing federal immigration laws, we agree with the district court that Alas's argument is "untenable." J.A. 329.

1.

Alas's assertion that he was found in Texas when he spoke with Landaverde is divorced from the text of Section 287(g). Rather than confer enforcement ability on an entire office, Section 287(g) explicitly delegates this prerogative only to certain qualified officers and employees.

As noted, the relevant provisions of the statute specify that "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, *pursuant to which an officer or employee* of the State or subdivision, *who is determined by the Attorney General to be qualified* to perform a function of an immigration officer" may enforce federal immigration law. 8 U.S.C. § 1357(g)(1) (emphases added). Moreover, the agreement "shall require that an officer or employee . . . shall have knowledge of, and adhere to, Federal law," and "shall contain a written certification that the officers or employees . . . have received adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g)(2).

Subsection 5 of the statute bolsters its individualized nature. It explains that the written agreement between ICE and the local law enforcement office will specify "*each* officer or employee . . . who is authorized" to enforce immigration laws, "the specific

9

powers and duties that may be, or are required to be, exercised or performed by the *individual*, the duration of the authority of the *individual*, and . . . who is required to supervise and direct the *individual*." 8 U.S.C. § 1357(g)(5) (emphases added). If an entire office could be designated to enforce federal immigration laws, then this language would be superfluous. All that would be needed is a designation of a "State or political subdivision of a State." Yet when the phrase "State or political subdivision of a State" appears, it is qualified by the phrase "an officer or employee." 8 U.S.C. § 1357(g)(3)–(8), (10). We shall not bend the text to designate wholesale what it expresses in the particular.

If the clear text of the statute were not enough, the actual terms of the agreement between the HCSO and ICE dispel any notion that § 287(g) authorizes a blanket delegation of enforcement authority. The memorandum of agreement between the HCSO and ICE establishes in detail the process by which HCSO personnel are trained and certified. The agreement specifies that "HCSO will nominate candidates for ICE training," and that "HCSO agrees to use due diligence to screen individuals nominated for training." J.A. 280–81. Once individuals are nominated, "ICE will provide participating HCSO personnel with Immigration Authority Delegation Program (IADP) training," and then, upon successful completion of IADP training, these personnel "shall be deemed 'certified.'" J.A. 281–82.

This hardly sounds like an indiscriminate delegation of enforcement authority to the entire Harris County Sheriff's Office. To the contrary, this is an agreement crafted to ensure that each HCSO officer or employee tasked with enforcing federal immigration law is well-trained, tested, and certified. *See Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 464 (4th Cir. 2013) (explaining that § 1357 "allows *specific local officers* to perform the

10

functions of federal immigration officers") (emphasis added). HCSO employees lacking this certification remain typical state employees, unable to enforce federal immigration law.

Alas concedes that Landaverde lacked the training and certification required by both the governing statute and the specific memorandum of agreement. Alas therefore "can only show that state authorities were aware of his presence," and "courts have uniformly declined to find that state officials' knowledge of an alien's illegal presence in the United States may be imputed to federal immigration authorities to trigger the limitations period." *Uribe-Rios*, 558 F.3d at 353. Alas cannot prevail on the argument that, through his interaction with Landaverde, federal officials had knowledge of his presence in the United States. The statute of limitations has accordingly not run.

2.

Alas insists that the above statutory interpretation makes no sense. He claims it undercuts Congress's intention that a strict time limit be imposed on the ability of the federal government to enforce immigration and other criminal laws.

It is Alas's view, however, that contradicts both the Supreme Court's rulings and Congress's plain intentions. As the Court has noted, "[t]here are significant complexities involved in enforcing federal immigration law." *Arizona*, 567 U.S. at 409. Not just anyone can do it. What's more, immigration law touches international relations, as removal decisions "may implicate our relations with foreign powers." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976).

11

Moreover, some separation of law enforcement authority between federal and state governments is necessary to maintain a sense of balance. Allowing local law enforcement open-ended authority to arrest individuals for immigration violations would "infringe on the substantial discretion Congress entrusted to the Attorney General in making removability decisions, which often require the weighing of complex diplomatic, political, and economic considerations." *Santos*, 725 F.3d at 465. That is why federal laws and regulations require "written certification that officers have received adequate training to carry out the duties of an immigration officer." *Arizona*, 567 U.S. at 409 (citing § 1357(g)(2); 8 CFR §§ 287.5(c), 287.1(g)). The law makes clear that qualified means knowledgeable and knowledgeability leads to certification.

Section 287(g) correspondingly creates a regulated system in which designated individuals "receive[] adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g)(2). The training is quite specialized. The memorandum of agreement between the HCSO and ICE reinforces this imperative. The officers nominated to participate in the 287(g) program are subject to two background checks, one conducted by the HCSO and another conducted independently by ICE. Furthermore, ICE requires "continuous access" to the disciplinary records of the nominated officers. J.A. 281. "Before participating HCSO's personnel receive authorization to perform immigration officer functions granted under" the agreement, "they must successfully complete the [Immigration Authority Delegation Program] training," which is "provided by ICE instructors who will train participating HCSO's personnel in the enforcement of Federal immigration laws and policies, the scope of the powers delegated

12

pursuant to this [agreement] and civil rights and civil liberties practices." J.A. 281. HCSO personnel must then "pass ICE examinations after instruction." J.A. 282. All in all, the arrangement is a concerted rejection of amateurism, one befitting a sensitive and complex task.

To sanction what Alas suggests would invite chaos with a capital "C." On the broadest reading of Alas's argument, every one of the 5,000 employees at the HCSO would possess immigration enforcement authority. This would not only permit but require all clerical employees, medical personnel, and even paid interns to investigate and report the immigration status of each person with whom they interact.

Such a system reduces our immigration laws to a series of nearly impossible inquiries. Which employees "found" the alien? When did they find him? How definitively did they "find" him? Did they discuss the alien's immigration status? Are they required to ask? Or was it enough that they simply suspected an illegal presence? And so forth and so on. Because these questions may stretch back many years, ICE will have to find out if a particular state employee is still with the office. If not, can he or she be located? Will the employee even remember the asserted encounter? Did he inform anyone else at the office? When did he tell them? In short, the day-to-day operations of local police departments would be thrown into ill-suited and unwanted tasks, requiring constant recording of their employees' interactions with potential illegal aliens.

Prosecuting illegal reentry cases would likewise become more burdensome. To satisfy the five-year statute of limitations, prosecutors would need to undertake each

13

inquiry described above whenever a defendant alleged a "finding" that predated the five-year limitations period.

The legal landscape envisioned by Alas is a far cry from the system put in place by Congress. Enforcing federal immigration law is hard enough. We refuse to make it any more difficult by adopting Alas's prescription with all of its attendant troubles.

## III.

Because the statute of limitations has not run, dismissal was not warranted on that ground. We next consider Alas's collateral attack on his 2011 removal order. As with the first motion to dismiss, we review the district court's factual findings for clear error and its legal conclusions de novo. *Hosford*, 843 F.3d at 163.

The Supreme Court has recognized a due process right for an alien charged with illegal reentry to challenge his underlying removal order. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 837–38 (1987). Collateral challenges to removal orders, however, are highly disfavored. We have emphasized that "the interest in the finality of judgments is sufficiently strong that" "a collateral challenge" will only be permitted "in exceptional circumstances." *United States v. Cortez*, 930 F.3d 350, 357 (4th Cir. 2019); *see also In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998) ("The rule of finality has yielded only to narrow exceptions.").

For this reason, Congress codified three requirements for an alien to collaterally challenge his previous deportation order. 8 U.S.C. § 1326(d) permits a collateral attack only if "the alien demonstrates that (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation

14

proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d)(1)–(3). An alien must satisfy all three requirements to mount a successful challenge to his deportation order. *United States v. El Shami*, 434 F.3d 659, 663 (4th Cir. 2005).

At issue here are the second and third requirements of § 1326(d).[1] Alas first asserts that the failure to serve him an expedited removal form in a language he understood deprived him of "the opportunity for judicial review." 8 U.S.C. § 1326(d)(2). Alas next argues that "the order was fundamentally unfair," 8 U.S.C. § 1326(d)(3), because malicious wounding is not a deportable charge. To "demonstrate fundamental unfairness" under § 1326(d)(3), Alas "must show that (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." *United States v. Lopez-Collazo*, 824 F.3d 453, 460 (4th Cir. 2016) (internal quotation marks omitted).

We hold that Alas cannot show he suffered unfairness as required by § 1326(d)(3), because malicious wounding is indeed a removable offense. As his claim fails on the third requirement, we need not consider whether Alas could satisfy the other requirements of § 1326(d). *United States v. Moreno-Tapia*, 848 F.3d 162, 171 (4th Cir. 2017). Where an

---

[1] The parties agree that § 1326(d)(1) is not at issue. *See Etienne v. Lynch*, 813 F.3d 135 (4th Cir. 2015).

illegal alien "cannot show the requisite 'fundamental unfairness' . . . his collateral challenge fails for that reason alone." *Id.*

The gravamen of Alas's unfairness claim is that his conviction for Virginia malicious wounding does not qualify as an aggravated felony and thus he was not deportable as charged. After he was arrested in 2020, immigration officials found Alas was "deportable" because he had been previously "convicted of an aggravated felony." 8 U.S.C. § 1227(a)(2)(A)(iii). The term "aggravated felony" is defined elsewhere as a "crime of violence"—"an offense that has as an element the use, attempted use, or threatened use of physical force." 18 U.S.C. § 16(a); 8 U.S.C. § 1101(a)(43)(F).

Virginia Code § 18.2-51 provides that if "any person maliciously . . . wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall . . . be guilty of a Class 3 felony. If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony." Va. Code § 18.2-51. The illegal acts prohibited by § 18.2-51 are often referred to as malicious or unlawful wounding, with malicious wounding requiring a heightened mens rea.

Under this framework, the question becomes whether malicious wounding as defined by Virginia law has as an element the use, attempted use, or threatened use of physical force. We conclude that it does, whether we consider the law at the time of Alas's 2011 removal proceeding or any changes thereafter.

In 2011, Virginia malicious wounding was a crime of violence. We had earlier recognized that unlawful wounding was a crime of violence. *See United States v.*

16

*Etheridge*, 932 F.2d 318, 323 (4th Cir. 1991); *United States v. Candiloro*, 322 F. App'x 332, 333 (4th Cir. 2009). Then by 2009, we had likewise held that malicious wounding was a crime of violence. *See United States v. Washington*, 336 F. App'x 343, 345 (4th Cir. 2009). These holdings tracked the Virginia courts' treatment of this issue. *See Johnson v. Commonwealth*, 669 S.E.2d 368, 378 (Va. App. 2008) (explaining that malicious wounding "under Code § 18.2-51" requires a heightened mens rea beyond recklessness, which makes it a crime of violence); *Commonwealth v. Vaughn*, 557 S.E.2d 220, 222 (Va. 2002) (explaining the intent required under Section 18.2-51 is "the specific intent to maim, disfigure, disable or kill the victim of the attack"); *see also United States v. Rumley*, 952 F.3d 538, 551 (4th Cir. 2020) (confirming this interpretation); *Moreno-Osorio v. Garland*, 2 F.4th 245, 253–54 (4th Cir. 2021) (same in context of immigration).

Alas was therefore removable as charged in 2011. Per "the law as it was understood" at the time of Alas's removal proceedings, Virginia malicious wounding "constituted a 'crime of violence'" which thus consequently made it an "aggravated felony." *Lopez-Collazo*, 824 F.3d at 465. Alas was thus "deportable" by the plain text of the statute. 8 U.S.C. § 1227(a)(2)(A)(iii).

Alas believes, however, that the Supreme Court case of *Borden v. United States*, 141 S. Ct. 1817 (2021), changed the status of malicious wounding and thus disqualifies it as a deportable offense. *Borden* held that a crime requiring only a mens rea of recklessness is not a "violent felony." *Id.* at 1834. Alas's view is incorrect. Our court has already ruled that *Borden* did not change the status of malicious wounding as a crime of violence.

17

In *United States v. Manley*, "we readily conclude[d] that Virginia unlawful wounding . . . satisfies the criteria set forth in *Borden* for a crime of violence, as the Virginia statute 'demands that the perpetrator direct his action at, or target, another individual,' and such a mens rea is greater than negligence or recklessness." 52 F.4th 143, 148 (4th Cir. 2022) (quoting *Borden*, 141 S. Ct. at 1825). Not only does Alas's argument fail under the law as it stood in 2011, but it also fails under the law as it stands today.

The Supreme Court has warned against opening the door to prolonged immigration proceedings. The "interest in prompt removal may be heightened" if "the alien is particularly dangerous[] or has substantially prolonged his stay by abusing the processes provided to him." *Nken v. Holder*, 556 U.S. 418, 436 (2009). As the Supreme Court has repeatedly stated, "[p]ostponing justifiable deportation (in the hope that the alien's status will change) . . . is often the principal object of resistance to a deportation proceeding." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999).

## IV.

The district court did not err in rejecting Alas's collateral attack on his removal order. Alas came here illegally, was convicted of an aggravated felony, was deported, then illegally reentered the country to commit another crime. His case falls right at the heart of what Congress sought to criminalize and the executive branch seeks to stop with the illegal reentry statute of 8 U.S.C. § 1326. We thus reject Alas's claims and affirm the judgment of the district court.

*AFFIRMED*