RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0136p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NOE FLORES-PEREZ,

*Defendant-Appellant.*

> No. 20-1077

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:19-cr-20004-1—David M. Lawson, District Judge.

Decided and Filed:  June 16, 2021

Before:  CLAY, READLER, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Colleen P. Fitzharris, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellant.  Kevin M. Mulcahy, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

CHAD A. READLER, Circuit Judge.  Noe Flores-Perez was charged with illegal reentry following his deportation and subsequent return to the United States.  In an effort to defeat the reentry charge, Flores-Perez collaterally attacks his initial removal order, alleging that the order was invalid due to a lack of notice.  The district court rejected Flores-Perez's argument because he failed to exhaust administrative remedies.  We agree and affirm on that ground.

**BACKGROUND**

As Flores-Perez was leaving a Michigan courthouse in 2001, immigration officials detained him and transported him to a nearby immigration office on the belief that Flores-Perez was in the country illegally. Flores-Perez provided immigration officials with two forms of state-issued identification, each of which contained his address. Officials then served Flores-Perez with a Notice to Appear, or NTA. The NTA alleged that Flores-Perez was a citizen of Mexico who had illegally entered the United States approximately 16 months earlier.

All of this, it seems, is relatively standard fare in the removal process. Unfortunately, what happened next is not. Although possessing Flores-Perez's identification cards listing his correct address—Apartment 311—immigration officials wrote an incorrect address—Apartment 132—on the NTA. Nonetheless, Flores-Perez signed the NTA with the incorrect address, attesting to its accuracy. No interpreter assisted with the initial processing. As Flores-Perez left the immigration office, however, a Spanish-speaker gave him a number of relevant documents, including a copy of the NTA he had signed, and told Flores-Perez in Spanish that he would receive another document in the mail from immigration officials.

In April 2002, the immigration court sent a Notice of Hearing to the address on the NTA. The Notice of Hearing stated that Flores-Perez's removal hearing would occur on January 22, 2003. The Notice was returned to the immigration court, however, because "no such number" existed at the apartment complex. When Flores-Perez did not attend the hearing, the immigration judge proceeded in absentia and ordered Flores-Perez removed. The removal order was mailed to the same address as the Notice of Hearing, and, like the Notice, was also returned to sender.

In 2009, immigration officials arrested Flores-Perez in Michigan. In accordance with his 2003 removal order, Flores-Perez was deported a few days later. Flores-Perez alleges in an affidavit that he tried to find an immigration lawyer following his arrest but failed to do so in advance of his deportation.

Flores-Perez unlawfully returned to the United States later that year. Roughly nine years later, in December 2018, he was arrested after he was caught attempting to break into an

apartment in suburban Detroit. Ten days later, immigration officers arrested Flores-Perez for reentry after deportation in violation of 8 U.S.C. § 1326(a), and a federal grand jury indicted him on the charge. Before the district court, Flores-Perez made a number of arguments as to why his indictment should be dismissed, each of which was premised on the notion that he did not receive adequate notice of his 2003 removal hearing. The district court denied the motions. Flores-Perez pleaded guilty, preserving his right to appeal the denial of his motions to dismiss. This appeal followed.

## ANALYSIS

We review de novo the district court's "denial of a motion to dismiss an indictment and a collateral attack upon a prior removal order underlying a conviction for unlawful reentry." *United States v. Silvestre-Gregorio*, 983 F.3d 848, 851 (6th Cir. 2020) (quoting *United States v. Zuniga-Guerrero*, 460 F.3d 733, 735 (6th Cir. 2006)). We review any factual findings for clear error. *Id.*

1. Flores-Perez brings a collateral attack to challenge the validity of, and undo, his 2003 removal order. Were he to succeed, Flores-Perez would overcome his charge of unlawful reentry. *See United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1619–20 (2021). The task before him, however, is not an easy one. *See United States v. Parrales-Guzman*, 922 F.3d 706, 707 (5th Cir. 2019) (noting that 8 U.S.C. § 1326(d) captures "Congress's mandate that collateral review in the course of re-entry prosecutions be available only in a narrow set of circumstances"). To prevail, Flores-Perez must show that "(1) [he] exhausted any administrative remedies that may have been available to seek relief against the [underlying removal] order; (2) the deportation proceedings at which the order was issued improperly deprived [him] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." *Palomar-Santiago*, 141 S. Ct. at 1619–20 (quoting 8 U.S.C. § 1326(d)). These requirements are conjunctive, meaning Flores-Perez's failure to satisfy any one of them defeats his collateral challenge. *Id.* at 1620–21.

The Supreme Court's recent decision in *United States v. Palomar-Santiago* confirms the mandatory nature of § 1326(d)'s conditions. *See id.* Palomar-Santiago, a Mexican national with

permanent resident status, was convicted for felony driving under the influence (DUI), and ultimately was ordered removed for committing a "crime of violence." *Id.* at 1620. Palomar-Santiago later returned to the United States. *See id.* When he eventually was discovered, he was indicted for unlawful reentry after removal. *Id.* Palomar-Santiago responded by collaterally challenging his initial removal order. *Id.* He did so on the basis that, between his removal and indictment, the Supreme Court held that a DUI offense cannot qualify as a crime of violence. *Id.* (quoting *Leocal* v. *Ashcroft*, 543 U.S. 1, 11 (2004)). Palomar-Santiago brought his collateral challenge, however, without first pursuing administrative remedies to challenge his underlying removal order. *Id.* Despite that omission, the district court awarded Palomar-Santiago collateral relief—a decision that the Ninth Circuit later affirmed—on the basis that the absence of a removable offense excused Palomar-Santiago from satisfying the first two elements of § 1326(d). *Id.* The Supreme Court granted certiorari.

The Supreme Court reversed. It read § 1326(d) not to permit "extrastatutory exception[s]." *Id.* at 1621. Rather, the statute's conjunctive and mandatory language, when read together, prohibits a court from excusing a failure to exhaust, as "the substantive validity of the removal order is quite distinct from whether the noncitizen exhausted his administrative remedies . . . or was deprived of the opportunity for judicial review . . . ." *Id.* In other words, "[t]he immigration judge's error on the merits does not excuse the noncitizen's failure to comply with a mandatory exhaustion requirement if further administrative review, and then judicial review if necessary, could fix that very error." *Id.*

*Palomar-Santiago* forecloses relief for Flores-Perez. Flores-Perez failed to challenge his removal order in any respect until filing this collateral challenge, nearly twenty years after the order was issued, and after Flores-Perez was deported due to the order. And he has never sought to challenge the order through administrative channels. As a result, he has failed to satisfy the first element of a collateral attack—administrative exhaustion. *See id.* at 1619 (explaining that noncitizens facing removal can raise defenses at removal hearings and, if unsuccessful, can appeal to the Board of Immigration Appeals); *see also* 8 C.F.R. § 1240.15 (permitting appeals from immigration judges to the Board of Immigration Appeals except from removal orders entered in absentia); 8 U.S.C. § 1229a(b)(5)(C) (establishing when a noncitizen may move to

reopen a removal order entered in absentia). Under *Palomar-Santiago*, that shortcoming resolves this dispute in favor of the United States. 141 S. Ct. at 1620–22.

2. Flores-Perez, to his credit, all but concedes that he has not pursued administrative remedies. Yet he asks us to excuse that failure. Essentially collapsing all three collateral attack inquiries into one, Flores-Perez asserts that the lack of sufficient notice of his removal proceeding effectively made any administrative remedies unavailable to him, improperly deprived him of the opportunity for any judicial remedy, and was fundamentally unfair, in that he suffered a prejudicial due process injury. In effect, Flores-Perez asks us to excuse § 1326(d)'s exhaustion requirement due to an alleged procedural flaw in his removal process. That position, however, is almost identical to the one rejected in *Palomar-Santiago*. *See* 141 S. Ct. at 1621. Applying that holding here, even if Flores-Perez's removal was flawed, that error "does not excuse [Flores-Perez]'s failure to comply with a mandatory exhaustion requirement" because "administrative review, and then judicial review if necessary, could fix [the] error," if any. *Id.* The bottom line is that Flores-Perez could have pursued administrative remedies, but chose otherwise. *See* 8 U.S.C. § 1229a(b)(5)(C)(ii) (establishing that a noncitizen may move to reopen a removal order entered in absentia "at any time" based on a demonstrated lack of proper notice).

Flores-Perez next seeks to excuse his failure to comply with § 1326(d) on the purported basis that he only had to exhaust remedies that were "available" to him and that the flawed notice "severely limited" the available remedies. But the relevant statutory scheme expressly contemplates how a noncitizen can proceed in the event of insufficient notice. *See* 8 U.S.C. § 1229a(b)(5)(C)(ii). Palomar-Santiago, it bears noting, similarly argued that "further administrative review of a removal order is not 'available' when an immigration judge erroneously informs a noncitizen that his prior conviction renders him removable." *Palomar-Santiago*, 141 S. Ct. at 1621. To be sure, in the prison litigation context, there can be "circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* (quoting *Ross v. Blake*, 578 U.S. 632, 643 (2016)). But nothing in that jurisprudential realm "suggests that the substantive complexity of an affirmative defense can alone render further review of an adverse decision 'unavailable.'" *Id.*

To sum up, all three conditions of a collateral attack must be satisfied to invalidate a removal order. *Id.* at 1620–21. And here, Flores-Perez failed to exhaust his administrative remedies—even with plain notice of the removal order as reflected by his 2009 deportation. With Flores-Perez having failed to avail himself of the administrative remedies available to him, allowing him to invalidate his removal order in this collateral setting would be "incompatible with the text of § 1326(d)." *Id.* at 1620.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.