**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-4061

UNITED STATES OF AMERICA,

        Plaintiff - Appellant,

   v.

BONIFACIO FERNANDEZ SANCHEZ,

        Defendant - Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Charlottesville. Norman K. Moon, Senior District Judge. (3:18-cr-00022-NKM-JCH-1)

Argued: May 4, 2022                            Decided: August 23, 2022

Before GREGORY, Chief Judge, and MOTZ and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Gregory and Judge Motz joined.

**ARGUED:** Laura Day Taylor, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellant. Erin Margaret Trodden, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Harrisonburg, Virginia, for Appellee. **ON BRIEF:** Thomas T. Cullen, United States Attorney, Christopher R. Kavanaugh, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellant. Juval O. Scott, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Roanoke, Virginia, for Appellee.

WYNN, Circuit Judge:

Bonifacio Fernandez Sanchez, a Mexican citizen who migrated to the United States illegally as a minor in 2006, was deported in 2011 following a four-minute removal hearing. During that hearing, the immigration judge neglected to advise Fernandez Sanchez about his eligibility for voluntary departure or inform him of his right to appeal. Then, in his written summary order, the immigration judge indicated that Fernandez Sanchez had waived his right to appeal—even though this was never discussed during the hearing.

In the years since, Fernandez Sanchez has returned to the United States and been deported multiple times. Upon discovering him in the country once again in 2018, the Government opted to arrest and charge him with illegal reentry in violation of 8 U.S.C. § 1326(a). Fernandez Sanchez moved to dismiss his indictment, arguing that the 2011 deportation order underlying his § 1326 charge was invalid.

The district court agreed, finding that the immigration judge's failure to advise Fernandez Sanchez regarding his eligibility for voluntary departure rendered his 2011 removal fundamentally unfair. However, while this appeal was pending, we effectively rejected the district court's reasoning in *United States v. Herrera-Pagoada*, 14 F.4th 311 (4th Cir. 2021). Fernandez Sanchez nevertheless maintains that the district court's decision must be affirmed on an alternative basis: that the immigration judge's denial of his right to appeal also prejudiced him. We agree, and therefore affirm the dismissal of Fernandez Sanchez's indictment.

2

I.

The following facts are undisputed. Fernandez Sanchez is a native and citizen of Mexico who first entered the United States as a minor in 2006. While residing here, Fernandez Sanchez started a family and fathered two children, both of whom are U.S. citizens.

In 2010, Fernandez Sanchez was arrested for driving under the influence. The police department referred him to U.S. Immigration and Customs Enforcement ("ICE"). While he was in ICE custody, the Government served him with a Notice to Appear before an immigration judge, alleging that he had entered the country without being admitted or paroled following an inspection by an immigration officer. Instead of admitting he was in the United States illegally, Fernandez Sanchez requested a hearing before an immigration judge. The hearing took place on June 30, 2011.

At that hearing, the immigration judge failed to abide by several procedural requirements. *See* 8 C.F.R. § 1240.10(a) (2011). For example, the immigration judge did not advise Fernandez Sanchez of his "right to representation" and the availability of pro bono legal services, or ensure that Fernandez Sanchez received a list of local pro bono legal service providers. *Id.* § 1240.10(a)(1)–(3) (2011). The immigration judge also did not explain "the factual allegations and the charges in the notice to appear" to Fernandez Sanchez in "non-technical language"; advise him that he would "have a reasonable opportunity to examine and object to the evidence against him" and "to present evidence" on his own behalf; or place him "under oath." *Id.* § 1240.10(a)(4)–(6) (2011). Nor did the

3

immigration judge inform Fernandez Sanchez of his right to appeal.[1] *See* 8 U.S.C. § 1229a(c)(5) (2011) (stating the immigration "judge *shall* inform the [noncitizen] of the right to appeal [an adverse] decision" (emphasis added)); 8 C.F.R. § 1240.10(a)(3) (2011) (requiring the judge to "[a]scertain" that the noncitizen has received "a copy of appeal rights"); 8 C.F.R. § 1240.13(d) (2011) (requiring an immigration judge to advise a removable noncitizen of their right to appeal to the Board of Immigration Appeals).

Instead, at the hearing—which lasted just over four minutes—the immigration judge started by asking Fernandez Sanchez via an interpreter whether he had an attorney. When Fernandez Sanchez responded he did not, the judge asked whether he "wish[ed] to find an attorney and contest the case, or [whether he] wish[ed] to return home to Mexico." J.A. 128 (audio recording).[2] Fernandez Sanchez—who conceded that he had entered the country illegally in 2006—replied that he would return to Mexico. But in response to further questions, Fernandez Sanchez stated that while he was not afraid to return to Mexico, he wished to remain in the United States because his children (who are U.S. citizens) and their mother all live here. He also emphasized that he had been "taking care of [his children] since they were born." J.A. 128.

---

[1] Fernandez Sanchez's Notice to Appear did state, in English, that he had a right to appeal an adverse decision by the immigration judge. However, Fernandez Sanchez does not speak English, and there is no evidence to suggest the Notice was ever translated to him in Spanish.

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

The immigration judge then asked whether Fernandez Sanchez had "the money to pay [for his] ticket to go back to Mexico." J.A. 128. In response, Fernandez Sanchez stated that he did not want to be deported.[3] He also noted that he did not have the money to pay for a ticket *at that time* because his money went toward supporting his children. Without any further investigation, the immigration judge then summarily ordered Fernandez Sanchez to be deported to Mexico and closed the hearing.

Following the hearing, the immigration judge memorialized his removal decision in a written form order. That order is supposed to be merely "a summary of the oral decision" entered at Fernandez Sanchez's hearing. J.A. 30; *see also id.* (stating that in the event of an appeal "the oral decision will become the official opinion in the case"). However, although neither the right to appeal nor any waiver of that right was discussed at the hearing, the immigration judge indicated on the written form order that Fernandez Sanchez had "[w]aived" his right to appeal. J.A. 30.

Normally, a noncitizen has thirty days to file an appeal of a removal decision. 8 C.F.R. §§ 1003.38(b), 1240.15 (2011). During this time period, the noncitizen generally may not be removed unless they waive their right to appeal. *Id.* § 1003.6(a) (2011). Since Fernandez Sanchez's order indicated he *had* waived his appellate rights, however, he was removed twenty-two days after his hearing on July 22, 2011.

Fernandez Sanchez was found again in the United States in January and February 2013. On both occasions, immigration authorities reinstated his 2011 deportation order,

---

[3] The interpreter did not translate this statement.

5

Fernandez Sanchez declined to contest their determinations, and he was subsequently removed.

Five years later, Fernandez Sanchez was arrested once more for driving under the influence. After he was transferred to ICE custody, a grand jury indicted him on one count of illegal reentry in violation of 8 U.S.C. § 1326(a). That section provides that "any [noncitizen] who . . . has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter . . . enters, attempts to enter, or is at any time found in, the United States, . . . shall be fined . . . , or imprisoned not more than 2 years, or both," with certain exceptions not applicable here. 8 U.S.C. § 1326(a) (2018).

Fernandez Sanchez moved to dismiss the indictment by collaterally attacking the underlying 2011 removal order pursuant to 8 U.S.C. § 1326(d).[4] Under that provision, Fernandez Sanchez was required to show that (1) he exhausted his administrative remedies, (2) he was denied the opportunity for judicial review, and (3) his removal was fundamentally unfair, meaning the immigration judge violated his due-process rights in a way that actually prejudiced him. *United States v. El Shami*, 434 F.3d 659, 663–65 (4th Cir. 2005) (citing 8 U.S.C. § 1326(d)).

---

[4] Fernandez Sanchez also initially argued that since his Notice to Appear "lacked not only the date and time of his removal hearing, but also the address of the immigration court where it would be filed," the immigration court lacked jurisdiction over him. J.A. 10. However, we squarely rejected this argument in *United States v. Cortez*, 930 F.3d 350, 362 (4th Cir. 2019), and Fernandez Sanchez "recognized before the district court that *Cortez* was dispositive" on that point. Response Br. at 4 n.2.

6

Fernandez Sanchez's motion claimed that the immigration judge's failure to inform him of his right to appeal satisfied the first two prongs. As for the third prong, his argument largely focused on a separate removal-hearing regulation that requires an immigration judge to "inform the [noncitizen] of his or her apparent eligibility to apply for" relief from removal and "afford the [noncitizen] an opportunity to make application [for such relief] during the hearing." 8 C.F.R. § 1240.11(a)(2) (2011). According to Fernandez Sanchez, the immigration judge shirked this duty when he failed to adequately inform Fernandez Sanchez of his potential eligibility for "[s]o-called 'pre-conclusion voluntary departure.'"[5] *Narine v. Holder*, 559 F.3d 246, 248 n.1 (4th Cir. 2009).

The district court agreed. The court accepted Fernandez Sanchez's logic that the immigration judge's failure to inform him of the right to appeal satisfied the first two prongs of the § 1326(d) analysis. As for the third prong, the court concluded that the immigration judge's "failure to apprise [Fernandez Sanchez] of his potential eligibility for pre-conclusion voluntary departure violated his due process rights." *United States v. Fernandez Sanchez*, No. 3:18-CR-00022, 2019 WL 7041513, at *5 (W.D. Va. Dec. 20, 2019). And the court further concluded that this failure prejudiced Fernandez Sanchez

---

[5] Pre-conclusion voluntary departure "allows a[] [noncitizen] charged with removability to depart the country voluntarily prior to the completion of removability proceedings," *Narine v. Holder*, 559 F.3d 246, 248 n.1 (4th Cir. 2009), so long as they satisfy certain regulatory factors and merit a favorable exercise of discretion, 8 C.F.R. § 1240.26(b)(1)(i) (2011) (listing factors); *In re Arguelles-Campos*, 22 I. & N. Dec. 811, 817 (B.I.A. 1999) (en banc) (holding that "discretion remains a required element of voluntary departure"). By contrast, post-conclusion voluntary departure provides similar relief "at the conclusion of the removal proceedings," with stricter eligibility requirements. 8 C.F.R. § 1240.26(c) (2011) (listing requirements).

because there was "a reasonable probability that he would have received voluntary departure had he been advised of it." *Id.* Having found that Fernandez Sanchez could satisfy all three prongs of § 1326(d) and therefore could successfully collaterally attack the underlying 2011 deportation order, the court dismissed the indictment. *Id.* at \*9. The Government timely appealed.

While this appeal was pending, we issued our opinion in *United States v. Herrera-Pagoada*. In that case, defendant Lexy Leonel Herrera-Pagoada sought to prove he was actually innocent of an 8 U.S.C. § 1326(a) violation "by collaterally attacking the removal order underlying his illegal reentry conviction." *Herrera-Pagoada*, 14 F.4th at 319. Like Fernandez Sanchez, Herrera-Pagoada argued that his due-process rights were violated by the immigration judge's failure to advise him that he was eligible for pre-conclusion voluntary departure. *Id.* at 320; *see id.* at 315 n.3. We rejected that argument, holding that a noncitizen "has no constitutional right to be advised of his eligibility for discretionary relief" such as pre-conclusion voluntary departure. *Id.* at 322.

After a round of supplemental briefing, Fernandez Sanchez now concedes that "*Herrera-Pagoada* forecloses [his] argument that he was denied due process by the [immigration judge's] failure to advise him of his eligibility for voluntary departure." Supp. Response Br. at 2. However, he claims he "suffered *another* due process violation, namely the denial of his right to appeal the [immigration judge's] removal order" via an uninformed—and apparently fabricated—waiver. *Id.* (emphasis added). Because this "violation has also prejudiced him," he urges us to affirm the district court on this alternative ground. *Id.*; *see United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 375

8

(4th Cir. 2015) ("[W]e may affirm a district court's ruling on any ground apparent in the record.").

## II.

A noncitizen charged with illegal reentry pursuant to 8 U.S.C. § 1326(a) must, as a matter of due process, be able to "collaterally attack the propriety of the[ir] original deportation order in the later criminal proceeding." *El Shami*, 434 F.3d at 663 (citing *United States v. Mendoza-Lopez*, 481 U.S. 828, 838–39 (1987), *superseded by statute as stated in United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1619 (2021) (citing 8 U.S.C. § 1326(d))). To successfully attack the underlying deportation order, the defendant must demonstrate that (1) he "exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived [him] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). "[I]f the defendant satisfies all three requirements, the illegal reentry charge must be dismissed as a matter of law." *El Shami*, 434 F.3d at 663.

The Government concedes that Fernandez Sanchez has satisfied the first two requirements. The only question presented on appeal, therefore, is whether he has also satisfied the third—showing that his deportation order was "fundamentally unfair." To establish fundamental unfairness, "a defendant must show that (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." *United States v. Wilson*, 316 F.3d 506, 510 (4th Cir.

9

2003), *abrogated on other grounds by Lopez v. Gonzales*, 549 U.S. 47 (2006). We consider each prong in turn.

### A.

Typically, the first question before us would be whether Fernandez Sanchez's uninformed and illusory waiver of his right to appeal violated his due-process rights. Fernandez Sanchez suggests that such an inquiry is unnecessary, however, because the Government failed to timely or adequately contest this issue, thereby waiving it. We agree.

In general, "[a] party waives an argument by failing to present it in its opening brief." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017); *see also* Fed. R. App. P. 28(a)(8)(A) (requiring the appellant's *opening* brief to contain their "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). Yet as the Government conceded at oral argument, it did not address Fernandez Sanchez's right-to-appeal due-process argument until its *supplemental reply* brief.

Though that alone would normally doom the Government's argument, we need not rely on that basis because even looking past the Government's delay, we still conclude the Government waived its argument. That's because a party also waives an issue by "failing to '"develop [its] argument"—even if [its] brief takes a passing shot at the issue.'" *Grayson O*, 856 F.3d at 316 (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015) (Agee, J., dissenting)). Here a "passing shot" is all that the Government took by effectively making a due-process "argument" that boils down to a single sentence in its brief. *See* Supp. Reply Br. at 3 ("[I]f the [immigration judge] has no constitutional duty to

10

inform the [noncitizen] about the possibility of applying for voluntary departure under *Herrera-Pagoada*, there cannot be an error of constitutional dimension in failing to inform the [noncitizen] that he can appeal the alleged failure to inform."). Given the complexity of the issue, we cannot say this single sentence suffices to preserve the Government's argument.[6] And we decline the Government's unspoken invitation to wade through the case law and make its argument for it.[7]

### B.

Because the Government waived any argument on the due-process issue, we assume that the immigration judge's denial of his appellate rights constituted a due-process

---

[6] Further, even this one sentence is not responsive to Fernandez Sanchez's argument. He does not just contend that the immigration judge failed to *inform* him of his right to appeal. Instead, he argues more broadly that the immigration judge effectively *denied* his right to appeal by "[o]btaining an invalid waiver" of said appellate rights. Supp. Response Br. at 3–4 (quoting *United States v. Gomez*, 757 F.3d 885, 893 (9th Cir. 2014)).

[7] As Fernandez Sanchez notes in his supplemental response brief, the Ninth Circuit has repeatedly found that an "invalid waiver of the right to appeal a deportation order violates due process." *Gomez*, 757 F.3d at 893; *see also United States v. Pallares-Galan*, 359 F.3d 1088, 1098 (9th Cir. 2004) (finding a due-process violation where an immigration judge informed a noncitizen of his right to appeal but failed to give him adequate time to consider his options or follow up once the noncitizen conveyed "significant confusion about what the appeals process would have entailed"); *United States v. Lopez-Vasquez*, 1 F.3d 751, 753–54 (9th Cir. 1993) (per curiam) (holding that a noncitizen's silent waiver of his appellate rights violated due process because it was neither "considered" nor "intelligent"). We have also recognized the "due process implications" of a noncitizen's "waiver of his appellate rights" in a similar setting. *Narine*, 559 F.3d at 249–50 (first quoting *In re Ocampo-Ugalde*, 22 I. & N. Dec. 1301, 1304 (B.I.A. 2000)). The Government's one-sentence due-process argument ignores these decisions, however, leaving us guessing whether any contrary authority exists. And while we could certainly scour Westlaw for contrary cases or attempt to distinguish those cases cited by Fernandez Sanchez, that is not our role.

11

violation and proceed to the second step of the § 1326(d) "fundamental unfairness" inquiry. *See United States v. Vasquez Flores*, No. 19-4190, 2021 WL 3615366, at *3 (4th Cir. Aug. 16, 2021) (per curiam) (evaluating only the second step of this inquiry where that was the only issue disputed by the parties). Accordingly, we turn to the question of whether Fernandez Sanchez has shown that the immigration judge's denial of his appellate rights prejudiced him. We conclude that he has.

To satisfy the second step of the fundamental-unfairness inquiry, "a defendant must show that he suffered actual prejudice as a result of the due process violations in the removal proceedings." *United States v. Lopez-Collazo*, 824 F.3d 453, 462 (4th Cir. 2016) (emphasis omitted). "This is not a generalized showing of prejudice; rather, the defendant must link the actual prejudice he claims to have suffered to the specific due process violation at issue." *Id.* However, that link need not be ironclad—a defendant need not show with certainty that the violation altered the outcome. So long as the defendant shows that "but for the [due-process] errors complained of, there was a *reasonable probability* that he would not have been deported," the prejudice prong is satisfied. *El Shami*, 434 F.3d at 665 (emphasis added). A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Terrazas-Silas*, 811 F. App'x 845, 847 (4th Cir. 2020) (per curiam) (quoting *United States v. Fulks*, 683 F.3d 512, 517 (4th Cir. 2012), in the context of a § 1326(d) prejudice evaluation).

Though the parties agree on this standard, they disagree on the applicable standard of review. The Government urges us to review the district court's prejudice finding—or at least those portions still relevant to the right-to-appeal due-process violation—de novo,

12

consistent with our 2003 decision in *Wilson* and our 2005 decision in *El Shami*. *See Wilson*, 316 F.3d at 509 ("This court reviews Wilson's challenge to his conviction [via 8 U.S.C. § 1326(d)] *de novo*."); *El Shami*, 434 F.3d at 663 ("This Court reviews de novo the denial of a motion to dismiss a charge under 8 U.S.C. § 1326(d).").

Fernandez Sanchez, by contrast, argues that we should apply the more nuanced standard of review adopted in our 2016 decision in *Lopez-Collazo*, which relied on earlier motion-to-dismiss-an-indictment case law. *See Lopez-Collazo*, 824 F.3d at 460 ("In considering the district court's grant of a motion under § 1326(d) to dismiss an indictment, we review the court's legal conclusions de novo and its factual findings for clear error." (citing *United States v. Woolfolk*, 399 F.3d 590, 594 (4th Cir. 2005))). And since some portions of the district court's prejudice analysis rest on discrete factual findings, the argument goes, we should review those underlying determinations for clear error only.

Our sister circuits have largely coalesced around a de novo standard when it comes to reviewing a district court's *overall* prejudice finding for a § 1326(d) collateral attack.[8]

---

[8] *See United States v. Luna*, 436 F.3d 312, 316 (1st Cir. 2006) (holding "that a district court's determination of whether a defendant has established prejudice pursuant to 8 U.S.C. § 1326(d)(3) is subject to *de novo* review"); *United States v. Scott*, 394 F.3d 111, 116 (2d Cir. 2005) ("Because [a § 1326(d) inquiry] entails mixed questions of law and fact, we review *de novo* the district court's denial of [the defendant's] motion to dismiss the indictment."); *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1047 (9th Cir. 2004) ("We review de novo [']the denial of a motion to dismiss an 8 U.S.C. § 1326 indictment when the motion to dismiss is based on alleged due process defects in an underlying deportation proceeding.'" (quoting *United States v. Muro-Inclan*, 249 F.3d 1180, 1182 (9th Cir. 2001))); *United States v. Aguirre-Tello*, 353 F.3d 1199, 1204 (10th Cir. 2004) (en banc) ("When a previous deportation proceeding is attacked on constitutional grounds, we are presented with a mixed question of law and fact, which we review de novo.").

13

However, some courts apply clear-error review to the factual findings *underlying* the overall prejudice determination.[9]

We need not decide today which of these standards of review applies, because the result is the same under either approach. Whether we review the relevant portions of the district court's prejudice analysis for clear error or consider them afresh, we conclude that Fernandez Sanchez has established a reasonable probability that he would not have been deported but for the immigration judge's denial of his appellate rights.

Both parties agree that for Fernandez Sanchez to make this showing, he must at least establish that (1) he would have successfully appealed if given the opportunity and (2) he would have sought and been granted voluntary departure on remand. The Government further argues that Fernandez Sanchez must also show (3) that he would actually have voluntarily departed. We proceed to analyze each step in turn.[10]

---

[9] *See United States v. Ramirez*, 962 F.3d 1056, 1059 (8th Cir. 2020) ("When reviewing a motion to dismiss an indictment under § 1326(d), we apply a clear error standard to the district court's findings of fact, but we review *de novo* whether the facts establish a due process defect."); *United States v. Silvestre-Gregorio*, 983 F.3d 848, 851 (6th Cir. 2020) (applying de novo review to the "denial of a motion to dismiss an indictment and a collateral attack upon a prior removal order underlying a conviction for unlawful reentry," but holding that the district court's underlying "factual findings" are still reviewed for "clear error" (first quoting *United States v. Zuñiga-Guerrero*, 460 F.3d 733, 735 (6th Cir. 2006))).

[10] In conducting this analysis, we have not attempted to determine (nor do we think it would be appropriate to attempt to determine) a particular probability by which each step in this chain of causation must be shown. Instead, we have found that each has been established with sufficient surety for us to ultimately conclude that there is a reasonable probability Fernandez Sanchez would not have been deported but for the immigration judge's denial of his appellate rights. *See El Shami*, 434 F.3d at 665.

14

1.

To start, we examine whether Fernandez Sanchez would have successfully appealed, given the opportunity. We conclude he would have.

As a threshold matter, Fernandez Sanchez has sufficiently established that he would have appealed if given the chance. At the hearing, Fernandez Sanchez stated that he did not want to be deported and explained that he wished to remain in the United States with his minor children and their mother. An appeal offered the only realistic avenue of accomplishing both things. We also note that Fernandez Sanchez both exercised his right to an immigration hearing and requested reconsideration of the immigration judge's pretrial custody decision, indicating a willingness to utilize the legal process made available to him. So, we think it highly probable that Fernandez Sanchez would have appealed the immigration judge's removal order if given the opportunity.

We also believe that Fernandez Sanchez would have been successful on appeal. The Board of Immigration Appeals has held that an immigration judge's failure to consider a potentially eligible noncitizen for pre-conclusion voluntary departure is reversible error. *In re Cordova*, 22 I. & N. Dec. 966, 972 (B.I.A. 1999) (en banc) (faulting the immigration judge for failing to inform an apparently eligible—and counseled—noncitizen of the conditions under which the noncitizen could apply for voluntary departure and, as a result, denying the noncitizen "a meaningful opportunity to apply for this relief"). The Government concedes that the immigration judge made the same error here. *See* Opening Br. at 20 n.4 (admitting that the immigration judge "was not in compliance with binding caselaw," specifically *Cordova*); Reply Br. at 15 (same). Accordingly, we conclude that,

15

had the immigration judge not denied Fernandez Sanchez's right to appeal, he would have successfully appealed his removal order and the Board of Immigration Appeals would have remanded the case for further proceedings.

2.

Next, we consider whether Fernandez Sanchez would have been granted pre-conclusion voluntary departure on remand. Like the district court, we have little trouble answering in the affirmative.

To qualify for pre-conclusion voluntary departure, a noncitizen must (1) make a request for such voluntary departure "prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing"; (2) make "no additional requests for relief"; (3) concede removability; (4) waive appeal of "all issues"; and (5) not have been convicted of an aggravated felony. 8 C.F.R. § 1240.26(b)(1)(i) (2011). If a noncitizen satisfies all five regulatory factors, they must also show that they merit a favorable exercise of discretion. *In re Arguelles-Campos*, 22 I. & N. Dec. 811, 817 (B.I.A. 1999) (en banc) (holding that "discretion remains a required element of voluntary departure").

The Government does not dispute that Fernandez Sanchez meets the second, third, and fifth regulatory requirements. Nor does it contest the district court's finding that Fernandez Sanchez would have merited a favorable exercise of discretion. The Government does argue, however, that Fernandez Sanchez would not have satisfied the first and fourth regulatory requirements on remand. We consider both of these elements in turn.

16

i.

The Government first asserts that Fernandez Sanchez would have been unlikely to request voluntary departure on remand.[11] As support, it notes that Fernandez Sanchez "did not request voluntary departure" at his original hearing, which suggests he would be unlikely to request it on remand.[12] Opening Br. at 24. But as both parties agree, Fernandez Sanchez—who was acting pro se—was not advised that voluntary departure was an option at his original hearing. And it is difficult to imagine why we would consider a noncitizen's

_____

[11] The Government does not suggest that Fernandez Sanchez would be *unable* to request voluntary departure on remand because such a request would not be "prior to or at the master calendar hearing." To be sure, a master calendar hearing "is typically a[] [noncitizen]'s *first* appearance before an [immigration judge] in removal proceedings." *Mejia v. Sessions*, 866 F.3d 573, 577 n.2 (4th Cir. 2017) (emphasis added). Though a hearing following remand from the Board of Immigration Appeals would, in a literal sense, be Fernandez Sanchez's second hearing, we do not believe that would forestall him from timely requesting pre-conclusion voluntary departure on remand. After all, it was the immigration judge's failure to inform him of this relief at his first hearing that "denied [him] a meaningful opportunity to apply for this relief" at the earliest opportunity. *Cordova*, 22 I. & N. Dec. at 972. But since the Government does not contest the point, we consider it waived.

[12] The Government also half-heartedly argues that Fernandez Sanchez has never stated—in either district court or appellate filings—that "he would have actually applied for voluntary departure" on remand. Reply Br. at 21. In effect, the Government seems to be faulting Fernandez Sanchez for failing to make self-serving post-hoc arguments about what he would have done on remand. We are doubtful that he failed to do so. *See* Response Br. at 37 n.8 (noting that Fernandez Sanchez has argued from the very start that "he would have been *granted* voluntary departure," which "necessarily includes the component that, once properly advised, he would have requested it"). But even if he had, we fail to see how the lack of such post-hoc arguments is "evidence" that Fernandez Sanchez would not have requested and received voluntary departure on remand. Our prejudice inquiry concerns the facts at the time of the 2011 removal hearing—not self-serving statements made a decade later. To the extent that the Government is claiming that Fernandez Sanchez has *waived* the argument that he would have requested voluntary departure, we again note that we may affirm "on any ground apparent in the record." *Drakeford*, 792 F.3d at 375.

failure to request relief in these circumstances as evidence that, properly advised, the noncitizen would later decide not to request the same relief.

At any rate, as the district court observed, other evidence in the record strongly suggests that Fernandez Sanchez would have requested pre-conclusion voluntary departure on remand. *Fernandez Sanchez*, 2019 WL 7041513, at *9 (observing that "taking advantage of voluntary departure would have had clear pragmatic [and beneficial] consequences for Fernandez Sanchez"). As noted above, it is undisputed that Fernandez Sanchez's minor children lived in the United States, that he supported them, that the children's mother also lived in the United States, and that Fernandez Sanchez wished to continue living with them. If he had been properly informed of the benefits of voluntary removal, he would have known that his best bet for permanently reuniting with his family would be voluntary departure.[13] *See Dada v. Mukasey*, 554 U.S. 1, 11 (2008) (observing

---

[13] Though the Government does not raise the issue, it is worth noting that voluntarily departing would not have allowed Fernandez Sanchez to lawfully return to the United States any sooner. That's because whether or not he voluntarily departed, Fernandez Sanchez would have been barred from seeking lawful readmission to the United States for ten years. *See* 8 U.S.C. § 1182(a)(9)(A)(ii) (2011) (barring noncitizens involuntarily deported following a removal hearing from seeking readmission for ten years); *id.* § 1182(a)(9)(B)(i) (barring noncitizens who, like Fernandez Sanchez, have "been unlawfully present in the United States for one year or more," from seeking readmission for ten years, even if they voluntarily departed). However, if Fernandez Sanchez *had* voluntarily departed, he would not have been subject to a § 1326 criminal charge based on his 2011 removal order—a charge that could separate him from his family for years of prison time, followed by another deportation. A future application for lawful admission may also have been looked upon more favorably had he departed voluntarily rather than being deported. Additionally, voluntary departure would have allowed Fernandez Sanchez to avoid "extended detention pending completion of travel arrangements" and allowed him to "choose when to depart (subject to certain constraints)." *Dada v. Mukasey*, 554 U.S. 1,

18

that "by departing voluntarily the [noncitizen] facilitates the possibility of readmission"). Therefore, we are comfortable concluding that Fernandez Sanchez would have requested voluntary departure on remand.

                                    ii.

The Government also asserts that Fernandez Sanchez would not have been able to meet the voluntary-departure requirement that he waive appeal of all issues if he had already, in fact, appealed. That argument is fundamentally flawed.

To start, the Government's argument overlooks on-point administrative precedent. In *In re Cordova*, the Board of Immigration Appeals interpreted the very same waiver requirement and held that a noncitizen's "attempt to correct" an immigration judge's failure to inform him of his eligibility for voluntary departure "*through an appeal* should not cause him to lose the right to apply for voluntary departure [on remand] simply because his request was improperly denied." *Cordova*, 22 I. & N. Dec. at 970 (emphasis added). It is easy to see why—if the Government's reading held sway, then noncitizens would be stuck in a classic Catch-22: live with the immigration judge's error and therefore be prevented from seeking voluntary departure, or attempt to appeal said error and foreclose your ability to seek voluntary departure anyway.

The voluntary-departure regulation's plain text does not require such a Kafkaesque result. In fact, it commands the opposite. The relevant provision states (now, as it did at the

---

11 (2008). In other words, he could have actually said a proper goodbye to his family before departing.

19

time of the hearing in 2011) that a noncitizen "may be granted voluntary departure . . . only if" he or she "[w]aives appeal of all issues." 8 C.F.R. § 1240.26(b)(1)(i)(D) (emphasis added). Critically, "waives" is written in the present tense. And it is well settled that the present tense is an indicator that the text captures conduct occurring "in *the present or the future*, not in the past." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 59 (1987) (emphasis added). Thus, to be granted voluntary departure, a noncitizen must agree to waive *future* appeals, not demonstrate that they have not appealed in the past.[14]

With that cleared up, we easily conclude that Fernandez Sanchez would have waived his right to *future* appeals in order to pursue voluntary departure. The Government does not challenge any other aspects of the voluntary-departure inquiry, including the district court's conclusion that there is a reasonable probability such discretionary relief would have been granted. *Fernandez Sanchez*, 2019 WL 7041513, at *9. Because we reject the Government's contentions that Fernandez Sanchez would not have been eligible for voluntary departure, and because the Government has waived any other arguments against that eligibility by failing to raise them before us, we conclude that Fernandez Sanchez would have been granted voluntary departure on remand.

---

[14] This construction is further supported by other regulations which allow a noncitizen to appeal an immigration judge's decision "whether to grant voluntary departure." 8 C.F.R. § 1240.26(g) (2011); *cf. id.* § 1240.15 ("[A]n appeal shall lie from a decision of an immigration judge to the Board of Immigration Appeals."). There would be no reason to allow such an appeal if doing so automatically foreclosed the very relief sought by the appeal.

20

3.

The Government counters that even if the immigration judge granted voluntary departure and declined to deport Fernandez Sanchez, Fernandez Sanchez *still* must show that he would have actually departed in a timely fashion. We disagree.

The Government observes that under our precedent, a noncitizen must "show a reasonable probability *he would have not actually been deported*." Supp. Reply Br. at 3 (citing *El Shami*, 434 F.3d at 665). The Government concedes that if Fernandez Sanchez were granted voluntary departure, he would have avoided *immediate* deportation. However, the Government notes that "an [immigration judge] who grants voluntary departure must 'also enter an alternate order [of] removal,' which will automatically become a valid deportation order if the [noncitizen] does not comply timely with voluntary departure." Reply Br. at 21 (quoting 8 C.F.R. § 1240.26(d)). In other words, "if [Fernandez] Sanchez could not actually leave the country in a timely manner, he would have been deported." *Id.* According to the Government, this means Fernandez Sanchez must show not only that he would have been granted voluntary departure, but also that he "actually would have bought a ticket and voluntarily left the county."[15] *Id.* And the Government

---

[15] The Government cites our opinion in *El Shami* in support of this point. *El Shami* held that a noncitizen must show "there was a reasonable probability that he would not have been deported." 434 F.3d at 665. But it does not stand for the proposition the Government puts forward here: that, to show prejudice, an immigrant in Fernandez Sanchez's shoes must show that, but for the due-process violation, they would have avoided even *eventual* deportation via automatic operation of an alternate order of removal. That question was not before the Court in *El Shami*.

contends that Fernandez Sanchez could not have done so because he conceded that he did not have the funds to depart at the time of his hearing.

We disagree. Fernandez Sanchez's statement that he did not have funds "*now*"—at that moment, in the hearing—is not dispositive, because having the "means to depart the United States" is an element only of post-conclusion voluntary departure, not the *pre-conclusion* voluntary departure Fernandez Sanchez would have been seeking on remand.[16] *Arguelles-Campos*, 22 I. & N. Dec. at 817 (noting that a noncitizen "need not show that he . . . has the financial means to depart the United States" to receive pre-conclusion voluntary departure); *see* 8 U.S.C. § 1229c(a)(1), (b)(1)(D) (2011); 8 C.F.R. § 1240.26(b), (c)(1)(iv) (2011). All that Fernandez Sanchez needed to show is that, "but for" the immigration judge's denial of his appellate rights, "there was a reasonable probability that he would not have been deported" on July 22, 2011, pursuant to the order entered on the day of his hearing. *El Shami*, 434 F.3d at 665. He has made that showing.

True, it is theoretically possible that Fernandez Sanchez would have been subsequently deported via the alternate order of removal. However, that subsequent deportation would not have been caused by the immigration judge's failings, but rather by *Fernandez Sanchez's independent failure to timely depart* in accordance with the immigration judge's grant of discretionary relief. In other words, the chain of causation

---

[16] Upon being granted pre-conclusion voluntary departure, Fernandez Sanchez would have had time—up to 120 days, at the immigration judge's discretion, 8 U.S.C. § 1229c(a)(2)(A) (2011)—to gather the funds necessary to reach Mexico, a trip he could have undertaken overland from his home in Virginia.

connecting the immigration judge's due-process violation to Fernandez Sanchez's deportation would be broken. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (holding that the "subsequent acts of independent decision-makers . . . may constitute intervening superseding causes that break the causal chain between" one event and another). And since the prejudice prong is concerned with the impact of the *immigration judge's* due-process failings, not the *respondent's*, it would be odd to require the respondent to also show they would not have prejudiced themselves.[17] Further, at a more fundamental level, our concern under § 1326(d) is "the validity of the deportation order" under which Fernandez Sanchez was actually deported—not the validity of a hypothetical alternate deportation order that was never entered due to the immigration judge's own errors. 8 U.S.C. § 1326(d); *see id.* § 1326(a)(1).

---

[17] Such a showing would also be impossible to make in the mine run of cases. Because the means to depart is not an element of pre-conclusion voluntary departure, the immigration judge would normally have no reason to develop the record on this issue. *Cf. Arevalo Quintero v. Garland*, 998 F.3d 612, 622 (4th Cir. 2021) (broadly holding that an immigration judge has a "duty to develop the record in immigration court proceedings," based primarily on the text of the Immigration and Nationality Act). The only reason this issue was developed *at all* in Fernandez Sanchez's hearing appears to be the immigration judge's mistaken belief that ability to pay for departure is an element of pre-conclusion voluntary departure. Barring a similar error, there will be no way for a defendant to show on collateral attack that they could have financed their voluntary departure, based upon the record as developed before the immigration judge. Thus, the Government's view would create an incongruous situation in which neither the immigration judge nor the noncitizen would have any reason to develop the record as to whether the noncitizen would have the means to depart if granted voluntary departure—and yet, for that very reason, the noncitizen would be unable to collaterally challenge any error in the immigration hearing related to voluntary departure. For the reasons already given, § 1326(d) commands no such bizarre result.

23

Ultimately, we agree with Fernandez Sanchez that there is a reasonable probability that, but for the denial of his appeal rights, he would not have been deported. *See El Shami*, 434 F.3d at 665. Accordingly, we conclude that his 2011 removal hearing was fundamentally unfair.

### III.

For the foregoing reasons, we affirm the district court's dismissal of Fernandez Sanchez's indictment.

*AFFIRMED*