**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 24–4032**

—————

UNITED STATES OF AMERICA,

> Plaintiff – Appellee

v.

VICTOR MANUEL CASTRO-ALEMAN, a/k/a Alfredo Quinones Olmo,

> Defendant – Appellant.

—————

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Roderick Charles Young, District Judge.  (3:23-cr-00051-RCY-1)

—————

Argued:  December 13, 2024                    Decided:  June 26, 2025

—————

Before RICHARDSON, BENJAMIN, and BERNER, Circuit Judges

—————

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Berner and Judge Benjamin joined.

—————

**ARGUED:**  Patrick L. Bryant, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Robert Sunderland Day, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Geremy C. Kamens, Federal Public Defender, Alexandria, Virginia, Joseph S. Camden, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant.  Jessica D. Aber, United States Attorney, Richmond, Virginia, Vetan Kapoor, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

Victor Manuel Castro-Aleman was illegally brought to the United States in 1973 as an eight-year-old child.  After a tumultuous few decades and multiple run-ins with law enforcement, he was removed from the country in 2016.  But Castro-Aleman was then subsequently discovered in Virginia in 2023, and this time, he was criminally charged with illegal reentry.  Below, the district court rejected his argument that his 2016 removal order was invalid and thus incapable of supporting his illegal reentry charge.  Because we likewise find his argument unpersuasive, we affirm.

## I.      Background

Castro-Aleman was born in El Salvador.  In 1973, when he was eight years old, he fled the country after his father was killed by the left-wing faction during the country's civil war.  He came to the United States, entering illegally and settling first in California, then moving to Virginia in the 1980s.  He was issued a social security number and a work permit in the 1980s, and he received a Virginia driver's license in 1995.

Castro-Aleman's time in the United States was punctuated by repeated arrests across the decades beginning in 1990. Between 2009 and 2014, he was convicted of driving under the influence four separate times in Virginia.  The third time, he was sentenced to five years of imprisonment.  The fourth time, he was sentenced to another five years.  While he was in jail for the fourth DUI, he was visited by agents from Immigration and Customs Enforcement.  He presented the ICE agents with a false identity and claimed to be a United

2

States citizen in violation of the Virginia identity theft law, for which he received an additional twelve months.

ICE subsequently issued Castro-Aleman a Notice to Appear in removal proceedings and charged that he was subject to removal for three reasons: being an alien present in the United States without being admitted or paroled; being an alien who had been convicted of a crime involving moral turpitude; and being an alien who had been convicted of two or more offenses for which the aggregate sentences of incarceration exceeded five years. *See* 8 U.S.C. § 1182(a)(6)(A)(i), (a)(2)(A)(i)(I), (a)(2)(B).

On February 17, 2016, Castro-Aleman appeared *pro se* before an Immigration Judge ("IJ") by video conference. During the hearing, he expressed fear of returning to El Salvador because the left-wing faction that killed his father was back in power. On account of those fears, the IJ gave him some time to fill out an asylum application to remain in the United States. But the IJ candidly warned him that his chance of succeeding on his asylum application "[didn't] look real good." J.A. 32.

Approximately three weeks later, Castro-Aleman appeared again *pro se* before the same IJ again by video conference. He had not sent in his asylum application. When asked why, he explained that he "wasn't able to get [his] dad's death certificate." J.A. 35. The IJ did not explain that Castro-Aleman did not need his father's death certificate to apply for asylum. The IJ did, however, offer a few extra weeks for Castro-Aleman to complete and submit his asylum application, but he declined. Castro-Aleman instead asked for voluntary departure, a process by which he could leave the country of his own accord. But the IJ told him, "you're not a good candidate for that" because of the "multiple driving

3

under the influence convictions." J.A. 36. The IJ ultimately ordered Castro-Aleman to be removed normally.

The IJ then informed Castro-Aleman of the removal order by saying the following: "Sir, I've entered an order of removal for you back to El Salvador. Do you want to accept it as final and be removed or appeal it to a higher court?" J.A. 37. Castro-Aleman responded to this compound question with: "No. The only thing is that I don't have a passport or any ID. So I just want to know what do I need so you can send me back to my country?" J.A. 37. The IJ explained that the government would handle the removal process.

Castro-Aleman did not appeal his removal order. He was removed from the United States the next month.

At some point in the subsequent years, Castro-Aleman reentered the United States again without going through the proper immigration channels. In 2023, he was discovered in Virginia. Shortly after being discovered, Castro-Aleman was indicted by grand jury for violations of 8 U.S.C. § 1326(a) and (b)(1) for illegally reentering the United States.

Before the district court, Castro-Aleman moved to dismiss his indictment, arguing that his removal back in 2016 was invalid. The removal proceeding before the IJ violated the due process clause, he claimed, meaning that the removal itself was the product of an unconstitutional proceeding and therefore could not be used as the basis for an illegal reentry charge. But the district court rejected his claim, finding that he had knowingly and voluntarily waived his right to appeal the removal order back in his 2016 immigration

4

hearing. *United States v. Castro-Aleman*, 2023 WL 4937304, at \*3–5 (E.D. Va. Aug. 2, 2023). The district court thus denied Castro-Aleman's motion to dismiss. *Id.* at \*5.

Castro-Aleman subsequently pleaded guilty to illegal reentry but reserved the right to appeal the denial of his motion to dismiss. This is that appeal.

## II.    Discussion

### A.    The Statutory Scheme Under 8 U.S.C. § 1326

Under 8 U.S.C. § 1326(a), "any alien who—(1) has been . . . removed . . . and thereafter (2) enters, attempts to enter, or is at any time found in, the United States" "shall be fined under title 18, or imprisoned not more than 2 years, or both." The punishment is harsher for aliens like Castro-Aleman "whose removal was subsequent to a conviction for commission of three or more misdemeanors . . . or a felony (other than an aggravated felony)"; in such cases, the alien can be "imprisoned not more than 10 years." § 1326(b)(1).

A conviction under § 1326(a), however, requires that the alien's prior removal order be free from particular procedural defects. In *United States v. Mendoza-Lopez*, the Supreme Court held that "where the defects in an administrative proceeding [like a deportation hearing] foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense." 481 U.S. 828, 838 (1987). In response, Congress codified *Mendoza-Lopez*'s procedural protections in what is now

5

§ 1326(d).   *See United States v. Palomar-Santiago*, 593 U.S. 321, 324–25 (2021) (recounting the history of § 1326(d)).

Section 1326(d) allows aliens to defend a § 1326(a) charge by collaterally attacking the validity of a removal order.  But to succeed, the alien must first "demonstrate[] that": (1) he "exhausted any administrative remedies that may have been available to seek relief against the order"; (2) "the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review"; and (3) "the entry of the order was fundamentally unfair."  § 1326(d)(1)–(3).[1]  These three requirements "are concerned with procedural irregularities in immigration proceedings that may insulate the resulting orders from judicial review, making it fundamentally unfair to rely on those

---

[1] The text of § 1326(d) lays out its three requirements as threshold conditions that are distinct from the alien's underlying challenge to the validity of the § 1326(a) charge. *See* § 1326(d) ("[A]n alien may not challenge the validity of the deportation order . . . unless the alien demonstrates that . . ."); *see also Palomar-Santiago*, 593 U.S. at 324 ("§ 1326(d) establishes three prerequisites that defendants facing unlawful-reentry charges must satisfy *before* they can challenge their original removal orders" (emphasis added)). But this Court has often stated that satisfying the three § 1326(d) requirements would itself amount to a successful challenge, collapsing the two into one step. *See, e.g.*, *United States v. El-Shami*, 434 F.3d 659, 663 (4th Cir. 2005) ("[I]f the defendant satisfies all three requirements, the illegal reentry charge must be dismissed as a matter of law."); *United States v. Lopez-Collazo*, 824 F.3d 453, 458 (4th Cir. 2016) (same).
    Despite their superficial differences, these two approaches are the same.  Under *Mendoza-Lopez*, a successful challenge to the validity of a removal order requires *at most* what § 1326(d) requires at the threshold. *Compare Mendoza-Lopez*, 481 U.S. at 838–39, *with* § 1326(d).  The match is unsurprising—the statute was meant to codify the case. *See Palomar-Santiago*, 593 U.S. at 324–25.  So any situation where *all three* threshold requirements are met will also be sufficient to require dismissal of the illegal reentry charge under *Mendoza-Lopez*.  Thinking of them as a single step is thus an equivalent—and faster—way of understanding what is ultimately required of the alien.

orders in later criminal prosecutions." *United States v. Moreno-Tapia*, 848 F.3d 162, 166 (4th Cir. 2017) (citing *United States v. Sosa*, 387 F.3d 131, 136 (2d Cir. 2004)).

Sometimes, those "procedural irregularities" themselves prevent an alien from administratively exhausting his remedies. For example, the alien may fail to appeal his removal order to the Board of Immigration Appeals (BIA) because he is never informed that the right to appeal to the BIA exists. In such a circumstance where the failure to satisfy § 1326(d)(1) "is itself the product of a procedural flaw in the immigration proceeding," we have held, alongside several of our sister circuits, that the alien may be excused from satisfying the requirement.[2] *Moreno-Tapia*, 848 F.3d at 169; *see also, e.g.*, *Sosa*, 387 F.3d at 146–47; *Richardson v. United States*, 558 F.3d 216, 222 n.5, 223 (3d Cir. 2009).

---

[2] For the first time on appeal, the government argues that the Supreme Court's recent decision in *Palomar-Santiago* has foreclosed the option for an alien to excuse their failure to administratively exhaust under § 1326(d) in all cases. This is incorrect. To be sure, *Palomar-Santiago* contains language suggesting that there can be no excusal of § 1326(d)(1)'s administrative exhaustion requirement. 593 U.S. at 326. But *Palomar-Santiago* involved an alien who attempted to excuse his statutory requirements by demonstrating the "*substantive* validity" of his removal order. *Id.* at 327 (emphasis added). And substantive challenges to a removal order—*i.e.*, claims that the IJ erred in determining the alien's removability on the merits—are precisely what administrative and judicial review proceedings are for. So, as the Supreme Court explains, it would make little sense to permit an alien to sidestep the normal review process "if further administrative review, and then judicial review if necessary, could fix that very error." *Id.* at 328.

This reasoning for substantive errors does not apply to some procedural errors. A procedural error that would "render further review of an adverse decision 'unavailable'" would, by definition, not be able to be fixed on further review. *Id.* Were the Supreme Court foreclosing excusal of exhaustion for all procedural errors as well as all substantive ones, it presumably would have used reasoning applicable to both and not just the latter.

As confirmation, the Supreme Court in *Mendoza-Lopez* permitted aliens to collaterally challenge their § 1326(a) illegal reentry charges because of the Immigration Judge's "failure" "to explain adequately their right to suspension of deportation *or their right to appeal*" and thus were deprived of the opportunity to fix any errors in their removal (Continued)

In any case, be it by satisfaction or excusal, § 1326(d)'s plain text requires the alien to meet all three requirements. Failure on even one is fatal to the alien's collateral challenge. Below, the district court grappled with the difficult question of whether Castro-Aleman could meet the first two requirements, § 1362(d)(1) and (d)(2), and concluded that he did not. *See Castro-Aleman*, 2023 WL 4937304, at *4–5. But we need not analyze the district court's reasoning because "[w]e are . . . entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court." *Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003). And here, there exists a shorter path to the same destination: Castro-Aleman fails to demonstrate that his removal order was "fundamentally unfair" under the third requirement, § 1326(d)(3). We therefore affirm the district court's dismissal of Castro-Aleman's motion to dismiss and, consequently, his conviction under § 1326(a) and (b)(1).

### B.      The Deportation Proceeding Was Not Fundamentally Unfair

To demonstrate that the proceeding was "fundamentally unfair" under § 1326(d)(3), Castro-Aleman "must show that (1) his due process rights were violated by defects in his

---

orders on review. *See Mendoza-Lopez*, 481 U.S. at 839 (emphasis added). Reading *Palomar-Santiago* to categorically bar any excusal of § 1326(d)(1)'s administrative exhaustion requirement would amount to overturning this core holding of *Mendoza-Lopez*. This seems implausible given *Palomar-Santiago*'s recitation of *Mendoza-Lopez*'s holding without comment. *See Palomar-Santiago*, 593 U.S. at 324. We therefore reject the government's reading of *Palomar-Santiago*. In doing so, we part ways with the Sixth Circuit, which has adopted the government's reading. *See United States v. Flores-Perez*, 1 F.4th 454, 457–58 (6th Cir. 2021).

underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." *United States v. Fernandez Sanchez*, 46 F.4th 211, 218 (4th Cir. 2022) (quotation omitted).

Castro-Aleman has suggested two due process violations. The first is the IJ's failure to develop the record by informing him that he could apply for asylum. The second is the IJ's failure to inform him of the right to appeal. We reject the first as not being a violation of Castro-Aleman's due process rights. We accept the second as a violation of due process for the purposes of argument but find that Castro-Aleman cannot show that he suffered prejudice from that violation. So Castro-Aleman cannot show his proceeding was fundamentally unfair on either basis.

Castro-Aleman's first assertion is squarely foreclosed by our precedent. We have expressly held that "an alien has no constitutional right to be advised of his eligibility for discretionary relief." *United States v. Herrera-Pagoada*, 14 F.4th 311, 322 (4th Cir. 2021); *accord Fernandez Sanchez*, 46 F.4th at 218. So any failure of the IJ to inform Castro-Aleman of his ability to apply for asylum without his father's death certificate did not violate the due process clause. That is not to say that aliens have no right at all to be advised of their relief; immigration judges have an affirmative duty to develop the record on available relief, particularly for *pro se* aliens. *See Quintero v. Garland*, 998 F.3d 612, 632–33 (4th Cir. 2021). But "immigration judges' duty to develop the record in 8 U.S.C. § 1229a(b)(1)" is grounded in the Immigration and Nationality Act "rather than due process." *Id.* at 624 n.11. A violation of that statutory duty cannot help Castro-Aleman show that "his *due process* rights were violated." *Fernandez Sanchez*, 46 F.4th at 218 (emphasis added).

Castro-Aleman's second assertion is not foreclosed. It is indeed a violation of due process if "fundamental procedural defects of the deportation hearing . . . render[] direct review of the Immigration Judge's determination unavailable." *Mendoza-Lopez*, 481 U.S. at 841. And depending on the surrounding circumstances, "the failure of the Immigration Judge to explain adequately . . . [the] right to appeal" may "amount[] to a complete deprivation of judicial review" which too violates due process. *Id.* at 839–40. But it is not clear that Castro-Aleman was deprived of the opportunity to seek review of his removal order. The IJ asked Castro-Aleman whether he "want[ed] to accept [his order] as final and be removed or appeal it to a higher court?" J.A. 37. The government asserts that simply mentioning "appeal . . . to a higher court" is sufficient to inform an alien of their right to appeal. Resp. Br. at 28. Castro-Aleman counters that more is required, especially because the reference to "appeal" was contained within "a confusing compound question." Op. Br. at 33–34.

We need not settle this debate. Even if the IJ's cursory mention of "appeal" was insufficient to satisfy due process, Castro-Aleman cannot "show that he suffered actual prejudice" from his inability to seek review of his removal order. *Fernandez Sanchez*, 46 F.4th at 220 (quoting *Lopez-Collazo*, 824 F.3d at 462). "Actual prejudice" requires Castro-Aleman to show that "but for the due process errors complained of, there was a *reasonable probability* that he would not have been deported." *Id.* (quoting *El Shami*, 434 F.3d at 665) (cleaned up). So Castro-Aleman must show that he would have had a reasonable

probability of successfully appealing his removal order by showing that he was ineligible for removal.[3]

Unfortunately for Castro-Aleman, an appeal of his removal order would have been futile. There is no dispute over his extensive criminal history. At his removal hearing, he admitted that he came into the country unlawfully without going through proper immigration inspection. He admitted that he had been convicted of four DUIs. And in his motion to dismiss his indictment below, he admitted to the crime of identity theft.

Each of these three admissions is independently sufficient to support a valid removal order for Castro-Aleman. Coming into the country without going through proper immigration inspection violates 8 U.S.C. § 1182(a)(6)(A)(i). Being convicted of four DUIs and sentenced to an aggregate incarceration length of over five years violates § 1182(a)(2)(B). And committing identity theft as defined in Va. Code Ann. § 18.2-186.3(A)(2) is a crime of moral turpitude that violates § 1182(a)(2)(A)(i)(I). *See Salazar v. Garland*, 56 F.4th 374, 375 (4th Cir. 2023). All three violations establish that Castro-Aleman would be inadmissible into the country, and inadmissibility is the same as removability for aliens like Castro-Aleman who are present in the country unlawfully. *See* § 1225(a)(1) (aliens who are present in the country illegally are considered applicants for

---

[3] Castro-Aleman argues that he can show prejudice from the IJ's failure to develop the record by informing him about asylum relief. But as established above, that failure does not violate due process. And since he must "link the actual prejudice he claims to have suffered to the specific due process violation at issue," any prejudice that arises from that failure is irrelevant to the prejudice inquiry. *Id.* (quoting *Lopez-Callazo*, 824 F.3d at 462). So we need not consider whether Castro-Aleman could have received asylum if given the chance to apply.

11

admission); § 1227(a)(1)(A) (inadmissible aliens are removable). So Castro-Aleman was removable thrice over on undisputed facts. As such, he would not be able to show a "reasonable probability that he would not have been deported" even if given the chance to seek review. *Fernandez Sanchez*, 46 F.4th at 220.

\*          \*          \*

Years ago, Castro-Aleman was removed from this country after a brief hearing before an immigration judge. He was recently found in Virginia, having entered illegally. For that illegal reentry, he was criminally charged. Castro-Aleman now attempts to fend off that criminal charge by asserting under § 1326(d) that his prior hearing was procedurally defective, rendering his removal invalid. But he cannot show that his hearing was afflicted by a due process error that caused him actual prejudice under § 1326(d)(3). So the district court's denial of his motion to dismiss—and thus his conviction for illegal reentry—must be

*AFFIRMED.*